J.A. BEAVER, Plaintiff-Appellee,

v.

RAYONIER, INC., Defendant-Appellant.

No. 98-8457.

United States Court of Appeals,

Eleventh Circuit.

Sept. 13, 1999.

Appeal from the United States District Court for the Southern District of Georgia. (No. 2:97-CV-47-AAA), Anthony A. Alaimo, Judge.

Before CARNES, Circuit Judge, HILL, Senior Circuit Judge, and HOEVELER[*], Senior District Judge.

CARNES, Circuit Judge:

Plaintiff J.A. Beaver prevailed before a jury on his ADEA claim against his former employer Rayonier, Inc. ("Rayonier"). Rayonier now appeals the district court's denial of its motion for judgment as a matter of law and, in the alternative, for an amended judgment. For the reasons set forth below, we affirm.

## I. BACKGROUND

### A. FACTS

Rayonier, a North Carolina corporation which manufactures dissolving cellulose and fluff pulp, operates one of its two mills in Jesup, Georgia. Rayonier employs both hourly and salaried employees at the Jesup mill. Hourly employees are represented by one of four unions at the mill and their working conditions are determined through collective bargaining. Salaried employees are not represented by a union and their working conditions are set by Rayonier officials. In general, hourly employees do hands-on work while salaried employees do supervisory work.

The plaintiff J.A. Beaver began working as an hourly employee in the maintenance department of the Jesup mill in 1974. In 1980, Rayonier promoted him to the salaried position of shift maintenance

---

[*]Honorable William M. Hoeveler, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

foreman. In that position, Beaver trained hourly employees to work as instrument people, electricians, millwrights, pipefitters, welders, and machinists, and he supervised their work throughout the mill. In 1991, Rayonier transferred Beaver to the finishing room, where he supervised all maintenance work. In 1994, Rayonier again transferred Beaver, this time to the maintenance support unit-2 (MSU-2), where he supervised operation of the mill's rolling equipment. Beaver supervised the MSU-2 until he was terminated.

During the first quarter of 1996, the Jesup mill lost approximately $50 million in sales due to a decline in the price of pulp. According to Rayonier, that loss led the company to implement cost reductions at the mill. As part of that cost reduction, the company offered a voluntary early retirement program. Although 24 salaried employees retired as part of that program, that did not achieve as much savings as Rayonier wanted. As a result, Rayonier decided to terminate 10 salaried employees in a September 9, 1996 reduction in force (RIF). Beaver, who was 54 years old at the time, was one of two salaried employees terminated in the maintenance department. His position was eliminated as a result of Rayonier's decision to consolidate his MSU-2 supervisor position with the MSU-1 supervisor position. Rayonier assigned Silas Moxley, who was older than Beaver, to the new, consolidated position.

When Beaver was terminated, he told Rayonier he would take any available position with the company. Even though seven vacant supervisor positions were available at the time of Beaver's termination, Rayonier did not select him for another position. Instead, Rayonier chose employees who were younger than Beaver to fill six of those seven positions.

B. PROCEDURAL HISTORY

After his termination, Beaver filed a notice of charge of discrimination with the EEOC. Following the EEOC's issuance of a right to sue letter, Beaver filed this lawsuit alleging he had been terminated because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.,* and in order to deprive him of pension benefits in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.* The district court subsequently granted Rayonier's motion for summary

2

judgment with respect to the ERISA claim, but denied it with respect to the ADEA claim.

The ADEA claim was then tried before a jury. At the close of all the evidence, the district court denied Rayonier's motion for judgment as a matter of law. The jury then returned a verdict in Beaver's favor and awarded him $80,242 in backpay salary and benefits. In addition, the jury found Rayonier had wilfully discriminated against Beaver. Accordingly, the district court doubled the amount of Beaver's damages and, on February 17, 1998, entered judgment in favor of Beaver in the amount of $160,484.00.

Rayonier subsequently renewed its motion for judgment as a matter of law and moved in the alternative for an amended verdict. The district court denied those motions on April 6. Rayonier appealed.[1]

## II. ISSUES PRESENTED ON APPEAL

Rayonier's appeal requires us to address two issues: (1) whether the district court erred in denying Rayonier judgment as a matter of law on Beaver's ADEA claim; and (2) whether the district court erred in refusing to amend the judgment in regard to the amount of damages.

## III. STANDARDS OF REVIEW

"We review *de novo* a denial of judgment as a matter of law." *See Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1350 (11th Cir.1999). We review only for an abuse of discretion a district court's refusal to amend a judgment. *See Day v. Liberty Nat'l Life Ins. Co.,* 122 F.3d 1012, 1014 (11th Cir.1997) *cert. denied Liberty Nat'l Life Ins. Co. v. Day,* --- U.S. ----, 118 S.Ct. 1797, 140 L.Ed.2d 938 (1998).

## IV. DISCUSSION

A. WHETHER THE DISTRICT COURT ERRED IN DENYING RAYONIER JUDGMENT AS A MATTER OF LAW

---

[1]We raised *sua sponte* the jurisdictional question of whether the district court's February 17 judgment and April 6 order were final because the district court's February 17 judgment reserved the issue of whether the plaintiff was entitled to equitable relief. Beaver's complaint, however, did not specifically request equitable relief and any jurisdictional question concerning whether the district court's February 17 judgment and April 6 order were final was cured when the court entered a May 7 amended final judgment which deleted the reference to equitable relief. In addition, the parties have assured us that no issue remains in any form concerning whether Beaver is entitled to equitable relief. Accordingly, we have jurisdiction to consider Rayonier's appeal of the district court's amended final judgment.

As an initial matter, Rayonier argues it is entitled to judgment as a matter of law because Beaver failed to establish a prima facie case. That argument, however, comes too late. Because Rayonier failed to persuade the district court to dismiss the action for lack of a prima facie case and proceeded to put on evidence of a non-discriminatory reason—i.e., an economically induced RIF—for terminating Beaver, Rayonier's attempt to persuade us to revisit whether Beaver established a prima facie case is foreclosed by binding precedent. " 'When the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection the factfinder must then decide whether the rejection was discriminatory' and the question of whether the plaintiff properly made out a prima facie case is no longer relevant." *Tidwell v. Carter Products,* 135 F.3d 1422, 1426 n. 1 (11th Cir.1998) (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714-15, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983) and *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997)).

Rayonier also argues that it is entitled to judgment as a matter of law because Beaver did not produce sufficient evidence of intentional discrimination. Although neither the district court nor the court of appeals may revisit the existence of a prima facie case, the Supreme Court has emphasized that " '[t]he plaintiff retains the burden of persuasion [of showing intentional discrimination]. [H]e may succeed in this either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

In this case, Beaver makes two arguments in support of his position that the district court properly denied Rayonier judgment as a matter of law. First, he argues Rayonier's claim that it needed to conduct an economically induced RIF at the Jesup mill was merely a pretext for age discrimination. Second, Beaver argues that even assuming Rayonier did conduct a legitimate RIF in response to a loss of sales, Rayonier

4

discriminated against him by intentionally choosing younger employees to fill vacant positions which existed at the time of the RIF. We address each argument in turn.

1. *Whether Rayonier's Non-Discriminatory Reason for Terminating Beaver Was Pretextual*

Beaver argues he presented sufficient evidence for a jury to conclude that Rayonier's claim it needed to conduct a RIF for economic reasons was merely a pretext for age discrimination. He relies primarily on two types of evidence. First, Beaver points to evidence designed to show that, despite the $50 million drop in sales at the Jesup mill in 1996, economic conditions were not so bad that a RIF was necessary. Specifically, Beaver points to the following:

i) overall sales from all Rayonier facilities were still $1.2 billion in 1996;

ii) Rayonier wrote off $78 million in 1996 for closing its Port Angeles mill and $98 million for an accounting charge;

iii) Rayonier spent $150 million on new construction at its various facilities in 1996;

iv) Rayonier increased its repurchase of company stock from $16 million to $50 million;

v) Rayonier increased dividends in 1996 by 16% for the third straight year;

vi) several executives at the Jesup mill received large bonuses in 1996;

vii) the vast majority of supervisors at the Jesup mill received raises in 1996.

According to Beaver, this evidence shows that economic conditions were actually good for Rayonier in 1996 and that Rayonier, by focusing on the $50 million loss in sales, has misrepresented its financial condition in order to show the RIF was economically induced. In support of his argument, Beaver cites *Eskra v. Provident Life & Acc. Ins. Co.,* 125 F.3d 1406 (11th Cir.1997). In that case, the employer terminated the plaintiff because his office, according to the report of the employer's actuary, was unprofitable. We held that the plaintiff's evidence showing that the employer's actuary had biased the report in favor of unprofitability was sufficient to show the employer's reason was pretextual. *See id.* at 1412-13.

We find the evidence cited by Beaver insufficient to support a fact-finding that the RIF was a pretext for discrimination. Beaver's evidence concerning profitability at Rayonier as a whole, as opposed to the

5

profitability of the Jesup mill where the RIF was conducted, is irrelevant to the question of whether economic conditions at the Jesup mill led Rayonier to conduct a RIF. The fact that Rayonier chose to give bonuses and raises to various executives and supervisors at the Jesup mill does not mean the $50 million loss in sales suffered at the Jesup mill did not induce Rayonier to explore cost-cutting measures at that mill which ultimately resulted in the RIF there. Beaver's real beef seems to be that Rayonier chose to cut jobs to reduce costs instead of cutting out bonuses and raises. However, the employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions. It is not our role to second-guess Rayonier's decision to respond to a loss in sales at the mill by cutting its workforce. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) ("federal courts do not sit to second-guess the business judgment of employers") *cert. denied Combs v. Meadowcraft Co.,* --- U.S. ----, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Finally, unlike the plaintiff in *Eskra,* Beaver does not have any evidence showing Rayonier biased its data to show it had a $50 million loss in sales; there is no evidence to cast doubt on the existence or size of the loss at the Jesup mill.

Next, Beaver seeks to show the RIF was pretextual by pointing to evidence that around the time Rayonier terminated the ten salaried employees in the RIF, it hired some younger employees. Specifically, Beaver says Rayonier hired ten hourly employees in the maintenance department before the RIF and another twenty shortly after the RIF. He argues that evidence was sufficient for a jury to infer the RIF was a pretext to get rid of older workers. We disagree.

In *Watkins v. Sverdrup Technology, Inc.,* 153 F.3d 1308, 1315-16 (11th Cir.1998), we held that the fact a company eliminates some positions in a RIF while simultaneously hiring younger workers in other positions is not sufficient to show that the RIF was pretextual. A plaintiff must also show that the new positions were similarly situated to those that were eliminated in the RIF. *See id.; see also Furr v. Seagate Tech., Inc.,* 82 F.3d 980, 986 (10th Cir.1996) ("[p]laintiffs' evidence of [employer's] post-RIF hirings fail[ed] to show pretext because the people hired were not similarly situated to the [p]laintiffs."). In this case, Beaver

6

did not show that the new positions for which Rayonier hired hourly employees in the maintenance department were similarly situated to the positions eliminated in the RIF. All of the positions eliminated in the RIF were supervisor positions occupied by salaried employees, while the newly hired employees filled vacant hourly employee spots. Moreover, Beaver does not point to any evidence showing the newly hired hourly employees (or any other hourly employees) were placed in supervisor positions doing the duties of either his former position or any other supervisor position eliminated in the RIF.[2]

For those reasons, we reject Beaver's argument that he produced sufficient evidence to show Rayonier's decision to conduct the RIF was a pretext to conceal intentional age discrimination.

2. *Whether Rayonier Discriminated Against Beaver Because of His Age By Denying Him Vacant Supervisor Positions Which Existed at the Time of the RIF*

Beaver's second line of argument is that he presented sufficient evidence for a jury to find Rayonier intentionally discriminated against him because of his age in denying him vacant supervisor positions for which he was qualified and had applied at the time of his termination in the RIF. We agree.

The ADEA does not require employers to establish interdepartmental transfer programs during a RIF or to "transfer or rehire laid-off workers in the protected age group as a matter of course." *Jameson v. Arrow Co.,* 75 F.3d 1528, 1533 (11th Cir.1996). However, "a discharged employee who applies for a job for which [he] is qualified and which is available at time of [his] termination *must* be considered for that job along with all other candidates, and cannot be denied the position based upon [his] age." *Id.* (emphasis added).

---

[2]Beaver also asserts that Rayonier did not have any oral or written guidelines concerning how to choose the employees to eliminate in the RIF and that this fact establishes that the RIF was pretext. However, Beaver is incorrect in asserting that there were no guidelines. Mike Burch, one of Rayonier's decision-makers in the RIF, testified that all of the decision-makers in the RIF understood that the parameters of the RIF were to reduce costs by reducing the number of supervisors, maintain or improve the level of the organization, and do the above in a legal and ethical manner. To the extent that Beaver's argument rests on a complaint that Rayonier's guidelines were not written down, we decline to adopt a rule that a plaintiff can establish pretext merely by showing the employer did not place the reasons that factored into its termination decision in writing. What matters is whether there is evidence that the employer took an impermissible factor, such as age, into account in its decision-making process, not whether the reasons for its employment decisions are reduced to writing. Here, Beaver has failed to show that the decision to conduct the RIF was a pretext for age discrimination.

7

In this case, Beaver presented evidence that at the time of his termination in the RIF, there were seven vacant supervisor positions at the Jesup mill.[3]  Although Beaver, when he was told that his former position was being eliminated in the RIF, specifically informed Rayonier he was willing to take "anything" that was available, Rayonier chose to fill those seven positions with other employees, six of whom were younger than Beaver.  At the trial, Beaver and three of his co-workers at the mill testified that based on their familiarity with Beaver's extensive experience throughout the mill, the duties of the available positions, and the experience of the six younger employees who were selected for the vacant positions instead of him, Beaver was more qualified than each of those employees.

In addition to the evidence of his relative qualifications, Beaver presented evidence that Royce Daniel, the general manager of the Jesup mill and the ultimate decision-maker in personnel decisions at the mill, including those concerning Beaver, had expressed a desire to attract "younger, engineer-type employees or supervisors."[4]  While Daniel's comment does not rise to the level of direct evidence of discrimination, and would not be enough standing alone to show a discriminatory motive, a jury could infer from it some age-bias on Daniel's part when that comment is coupled with the other evidence in this case.[5]  *See, e.g., Burrell v. Bd. of Trustees of Ga. Military College,* 125 F.3d 1390, 1393 (11th Cir.1997) (statements by a decision-maker that are not direct evidence of discrimination may still be used as circumstantial evidence of a discriminatory motive).

---

[3]Those seven positions were as follows:  two Powerhouse Foreman positions, two Shift Production Superintendent positions, an Instrument Planner (or Facilitator) position, and two Shift Quality Supervisor positions.

[4]Beaver also cites, as evidence of age-bias, Daniel's statement at a supervisor's meeting that one could tell the age of the mill's workforce "by looking at all the bald heads out there."  Absent any evidence, however, that this innocuous statement was made in a context which made it derogatory, we find that the statement is not probative of age-bias on Daniel's part.

[5]Although we conclude that Daniel's comment, taken together with Beaver's other evidence, is relevant to establishing a discriminatory motive in Rayonier's decision not to select Beaver for any of the vacant supervisor positions, it does not affect our previous conclusion that Beaver failed to show that the RIF itself was pretextual.  Daniel's comment, standing alone, is insufficient to establish that Rayonier's decision to conduct a RIF in response to the mill's loss in sales was merely a pretext for age discrimination.

8

Rayonier offers several arguments in an attempt to rebut Beaver's evidence and persuade us it was not sufficient for a jury to find age discrimination. We find none of them persuasive. First, Rayonier attempts to distinguish Beaver from five of the seven employees it selected instead of Beaver to fill the vacant supervisor positions. Specifically, Rayonier notes that although two of the seven employees were, like Beaver, salaried employees whose former positions had been eliminated in the RIF, the other five (all of whom were younger than Beaver) were hourly employees who were "set-up" into the vacant supervisor positions. "Setting-up" refers to Rayonier's practice of placing an hourly employee into a supervisor position normally occupied by a salaried employee. The hourly employee is paid a higher hourly wage while he is "set-up" and does exclusively supervisor work instead of the hands-on work that he would otherwise do as an hourly employee. In addition, the union which represents the mill's hourly workers does not represent a "set-up" employee during the time he is in a supervisor position.

With regard to the five positions filled by "set-up" hourly employees, Rayonier takes the position that Beaver cannot rely on the fact that younger, hourly employees filled those positions as a basis for showing age discrimination. In support of its position, Rayonier points to our statement in *Marshall v. Western Grain Co., Inc.,* 838 F.2d 1165, 1170 (11th Cir.1988), that "because of their unique status in the workplace, bargaining unit employees are *never* similarly situated with non-bargaining unit employees." Rayonier argues that because the hourly employees are bargaining unit employees represented by unions and the salaried employees such as Beaver are not, Beaver was not similarly situated to the hourly employees who were "set-up" into the available salaried positions. We disagree. Because Rayonier's hourly employees are not represented by the union after they are "set-up" into supervisor positions, the categorical distinction we drew in *Marshall* between bargaining and non-bargaining unit employees does not distinguish the "set-up" hourly employees in this case from Beaver. Accordingly, in the circumstances of this case, the fact that Rayonier chose younger hourly employees for the vacant supervisor positions was evidence it discriminated against Beaver because of his age.

9

Rayonier's second argument also focuses on the five supervisor positions that were filled by the "set-up" hourly employees. Rayonier argues that because it chose not to eliminate any hourly employees' positions in the RIF, it is not proper for Beaver to compare himself to the five hourly employees who were chosen for the vacant positions. That argument is unpersuasive, because the vacant supervisor positions Beaver sought were available at the time of the RIF independent of any other positions Rayonier chose to eliminate or preserve. Rayonier fails to explain why the fact that it chose not to eliminate any positions occupied by hourly employees in the RIF bars Beaver from comparing himself to the hourly employees Rayonier selected to fill vacant supervisor positions not eliminated in the RIF, which Beaver wanted.

Third, Rayonier argues that at least with regard to the five vacant supervisor positions filled by the "set-up" hourly employees, those hourly employees were chosen not because they were younger, but because they were already working in the departments of the mill where the vacancies occurred. In contrast, Rayonier says it would have had to transfer Beaver from the maintenance department, Beaver's department prior to his termination, to one of the departments with a vacancy. Beaver, however, presented sufficient evidence for a jury to find that this reason was pretextual by showing that in the past, Rayonier had not required an employee to have worked in a particular department in order to be placed in a supervisor position in that department. Specifically, an employee named Marty Weathers testified at trial that, on a prior occasion, Rayonier had placed him in the supervisor position of Powerhouse Foreman and that he had done well in that position even though he had never worked in the powerhouse and was transferred from the technical department. Two of the vacant supervisor positions which were filled by younger hourly employees instead of Beaver were Powerhouse Foreman positions. In addition, Beaver also presented evidence that, although he was a supervisor in the maintenance department, he had performed work in the departments with the vacant supervisor positions.

Fourth, Rayonier argues that, consistent with its desire to cut costs at the mill, it chose other employees instead of Beaver for the vacant supervisor positions because it could pay them less than Beaver.

10

The problem with that argument is that when Beaver was informed his position was being eliminated in the RIF, he told Rayonier he was willing to take "anything" that was available at the mill. A jury could find that by expressing his unqualified desire to take any available position, Beaver indicated he was willing to take any available job at Rayonier, regardless of its pay. Because Rayonier was aware that Beaver was willing to accept any job, even if it paid less than his former position, a jury could rationally conclude that Rayonier's proffered cost-savings reason for selecting younger workers for the vacant supervisor positions instead of Beaver was pretextual.

Finally, Rayonier argues that the ageist comment by Daniel is no more than a stray comment which occurred several months before Beaver's termination. Citing *Tidwell v. Carter Products,* 135 F.3d 1422, 1427 (11th Cir.1998), Rayonier argues that stray ageist comments made several months before a plaintiff's termination are insufficient to present a jury question on the issue of discriminatory intent. That argument is unavailing for two reasons. First, *Tidwell* is distinguishable because the ageist comments in that case were not made by the ultimate decision-maker in the plaintiff's termination. *See id.* Second, and more importantly, we do not hold that Daniel's comment, taken alone, is enough to present a jury question on the issue of discriminatory intent. Instead, we hold that Daniel's comment, taken in connection with the evidence that Rayonier chose younger employees for six of the seven vacant supervisor positions, even though Beaver expressed his willingness to take any of those positions and presented evidence that he was more qualified than the younger employees, provided a sufficient basis for a jury to find that Rayonier intentionally discriminated against Beaver because of his age.[6]

---

[6]In addition to the arguments we have already discussed, Rayonier also seeks to raise the following arguments on appeal: (1) It rebutted any inference of age discrimination concerning its selection of younger hourly employees for the vacant supervisor positions by presenting testimony that "several of the hourly employees" placed into the vacant supervisor positions were chosen because they, unlike Beaver, had been "relief supervisors" in the past and had therefore actually performed the duties of those positions; (2) Although one of the vacant supervisor positions was filled by a younger, salaried employee (named Bruce Woodard) whose former position had been eliminated in the RIF, Beaver failed to present evidence rebutting Rayonier's non-discriminatory reason that Woodard was selected because he had greater familiarity with the mill's quality standards; (3) The fact that two supervisor positions which were available shortly before the RIF were filled by individuals who were older than Beaver is relevant to whether Beaver presented sufficient

11

B. WHETHER THE DISTRICT COURT ERRED IN REFUSING TO AMEND THE JUDGMENT

Rayonier argues the district court abused its discretion in refusing to amend the judgment to reflect the fact that the jury award of $80,242 in backpay salary and benefits was not substantially supported by the evidence. According to Rayonier, the evidence at trial supported an award of only $70,600.13. We disagree.

Beaver presented evidence showing he was entitled to $53,905[7] in backpay salary and $31,000 in backpay benefits, for a total of $84,905. Thus, the jury's verdict of $80,242 was well within the range of the evidence. Although there was also evidence supporting Rayonier's view that Beaver was entitled to approximately $10,000 less in backpay benefits, it was within the province of the jury to resolve that factual conflict in Beaver's favor. The district court did not abuse its discretion in declining to amend the judgment.

## V. CONCLUSION

AFFIRMED.

---

evidence of age discrimination; and (4) Although Beaver presented evidence that there were seven vacant supervisor positions at the time of the RIF, some of those positions had previously been filled and therefore were not actually vacant at the time of Beaver's termination in the RIF. Rayonier, however, failed to raise these arguments in its motion for judgment as a matter of law before the district court. Accordingly, we will not consider these arguments on appeal. *See, e.g., American Civil Liberties Union v. Barnes,* 168 F.3d 423, 435 (11th Cir.1999).

[7]The $53,905 figures reflects a $5,000 deduction for income Beaver earned from other employment after Rayonier terminated him.

12