Joseph L. WILLIAMS, Jr., Plaintiff,

v.

ALABAMA INDUS. DEV'T TR'G,
et al., Defendants.

Civ.A. No. 00–D–544–N.

United States District Court,
M.D. Alabama,
Northern Division.

May 4, 2001.

Elizabeth B. Carter, Hill Hill Carter Franco Cole & Black, Montgomery, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendants' Motion For Summary Judgment, which was filed March 20, 2001. Plaintiff Joseph L. Williams, Jr., filed a Response on April 4, and Defendants issued a Reply on April 11. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion is due to be granted.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). The parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

The court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely determines whether there is more than "some metaphysical doubt" about whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91

James M. Nolan, Anu M. Brady, Walston Wells Anderson & Bains, Birmingham, AL, for plaintiff.

L.Ed.2d 202 (1986) (citations omitted); *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FACTUAL BACKGROUND

Plaintiff Joseph L. Williams, Jr.,[1] alleges that Defendants[2] denied him several promotions and eventually terminated him because of his race and because he filed an EEOC charge. Williams, who is black, was a quality training specialist for Defendant AIDT, a public agency that works with businesses around the state.

Since March 1994, AIDT's system for assigning and promoting workers has been governed by the Shuford Consent Decree. The consent decree was designed to ensure a meritocratic employment system. Under the decree, employees must meet strict criteria before obtaining a promotion. AIDT Director Ed Castile determines whether those criteria have been met. If so, then Castile forwards a recommendation to the state's chancellor of postsecondary education for approval.[3]

AIDT employees are classified as either C–3, C–2, or C–1, with C–1 employees being the highest paid. Williams was a C–3 who was eager to move up the ladder. He applied for a promotion to C–1 warehouse coordinator in 1997, but he really had his eyes on a C–2 position. He requested a promotion to C–2 management trainer in 1998, and again in July 1999.[4] Castile has never classified any management trainer as C–2.[5] Castile denied Williams's request because Williams "did not have additional job responsibilities"

and no reorganization within his department justified the promotion. Castile encouraged Williams to develop a strategy for assuming more responsibility and noted that he would authorize a future promotion if Williams met the criteria established by the consent decree.[6]

The July 1999 rejection came around the same time that Williams was disciplined for various reasons, which are not related to this case. After July, Williams's personnel file had these disciplinary records as well as an earlier warning for using a state vehicle for personal use, in violation of state ethics policies. On September 24, 1999, Williams filed an EEOC charge, alleging race discrimination in connection with the July non-promotion.[7] A few months later, Castile got word that Williams had used an AIDT state vehicle for personal business once again. After an internal investigation, Castile determined that Williams also took the vehicle without signing it out and did not log the vehicle's mileage accurately.[8] Castile met with Williams and terminated him several days later.[9]

## IV. DISCUSSION

The issue presented is whether a rational jury could find that AIDT discriminated or retaliated against Williams. The court finds that all of Williams's claims are time-barred, except for those concerning the July 1999 promotion and the December 1999 termination. Defendants' Motion on the remaining claims is due to be granted.

1. "Plaintiff" or "Williams."

2. "Defendants" or "AIDT."

3. Castile Aff. ¶ 2; Def.Ex. C; Williams's Dep. at 43.

4. Williams's Dep. at 53–58, 122–23, 226–27.

5. Castile Aff. ¶ 4.

6. Castile Aff. ¶¶ 4–5; Pl.Ex. AA.

7. Pl.Ex. B; Def.Ex. F.

8. Def.Ex. H.

9. *Id.* Ex. J.

## A. *Race Discrimination*

The ultimate question in any employment case is whether the defendant acted with discriminatory intent. Williams argues that he has produced sufficient circumstantial evidence for his claims to survive summary judgment. Thus, the *McDonnell Douglas* burden-shifting analysis applies. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■■■ A plaintiff must first raise an inference of discriminatory intent. In failure to promote cases, this generally requires showing that: (1) Plaintiff belongs to a protected class; (2) he was qualified for the promotion; (3) he was rejected; and (4) the employer either continued to attempt to fill the position or filled the position with someone outside a protected class. *See Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir.1998). If the plaintiff carries his burden, then the defendant must proffer a legitimate, non-discriminatory reason for his action. The burden then shifts back to the plaintiff, who must show that the employer's proffered reason is a pretextual cover for discrimination. If the employee does not offer sufficient evidence showing that each and every proffered reason is pretextual, then summary judgment is mandatory. *See Chapman v. AI Transp.,* 229 F.3d 1012, 1037 (11th Cir.2000) (en banc) (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997)). If the employee meets this burden, however, then summary judgment is sometimes inappropriate, *see id.* at 1025 n. 11, and the trier of fact may then infer the ultimate fact of discrimination from the falsity of the employer's explanation and the circumstantial evidence presented. *See Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 1. *180–day filing window*

■■ Before turning to the merits, the court first focuses on Title VII's administrative prerequisites. Generally, an aggrieved employee may not obtain relief for any alleged discrimination occurring more than 180 days before he filed his administrative charge with the EEOC. *See* 42 U.S.C. § 2000e–5(e). An exception to the 180–day filing requirement arises when the discriminatory act constitutes a "continuing violation" of the statute. *See Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir.1992).

■■ Williams contends that he has alleged a *continuing violation* because AIDT denied his requests for promotions on multiple occasions. Thus, he would like to litigate events from 1997 and 1998, even though they transpired more than 180 days before his September 24, 1999 EEOC charge. The court finds that he may not.

■■ For continuous violation purposes, "[t]he emphasis is not upon the effects of earlier employment decisions; rather, it is upon whether any present *violation* exists." *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). An employee cannot use one timely-filed EEOC charge as a bootstrap for lapsed claims arising out of other remote, discrete events. *See Carter v. West Publ'g Co.,* 225 F.3d 1258, 1263–65 (11th Cir.2000) (distinguishing between ongoing acts of discrimination and single discriminatory acts followed by neutral, non-discriminatory consequences); *Lewis v. Board of Tr. of ASU,* 874 F.Supp. 1299, 1303 (M.D.Ala.1995).

Williams, by his own admission, requested promotions when the spirit moved him. He allegedly suffered injury on each of these separate, definable occasions. The acts came and went; only the consequences lived on. Black employees com-

miserated about AIDT's policies, thus suggesting an environment within which facts were not suppressed.[10] The court finds that a reasonable aggrieved person in Williams's position would have filed an EEOC charge well before September 24, 1999 if he wished to vindicate his rights. *See Malone v. K–Mart Corp.*, 51 F.Supp.2d 1287, 1301 (M.D.Ala.1999) (considering several factors with special emphasis on "whether the plaintiff's awareness triggered a duty to assert her rights"); *Galloway v. General Motors Serv. Parts Oper'ns*, 78 F.3d 1164, 1166 (7th Cir.1996) (Posner, C.J.) (statute of limitations in sexual harassment case tolls until "the harassment becomes sufficiently palpable that a reasonable person would realize she had a substantial claim.")

Therefore, Williams's race claim shall encompass only the July 1999 incident, which is all that fell within 180 days of the EEOC charge. *See Smith v. Alabama Dep't of Corr.*, 131 F.Supp.2d 1318, 1320–21 (M.D.Ala.2001); *Brewer v. Alabama*, 111 F.Supp.2d 1197, 1205 (M.D.Ala.2000); *Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1271 (M.D.Ala.1998).

### 2. The July 1999 promotion

The court finds that no rational jury could find that race played a role in AIDT's decision to deny Williams's request for promotion to C–2 management trainer. Williams cannot establish a prima facie case, nor can he rebut AIDT's race-neutral reasons for its decision.

Williams cannot discharge his initial burden of showing that he was qualified for the promotion sought. The Shuford Decree sets the criteria for promotion and restricts the number of C–2 positions

available. The decree provides, in pertinent part, that promotion may be warranted when:

1. A new position is created.
2. An existing job class specification/worksheet analysis is reclassified to a higher level of responsibility, difficulty, and duties are expanded dramatically.
3. A position becomes vacant due to staff retirement, resignation, or termination.[11]

Other sections of the decree further explain that AIDT, in its discretion, may promote an employee if he has taken on additional work duties.[12] A promotion also may be warranted based on a department's internal reorganization.[13] Thus, increased workload is neither a necessary nor sufficient condition for promotion. As Castile informed Williams, if there is no reorganization, promotions are "based on changes in work load that require significantly more responsibility."[14]

Williams asserts he should have got a promotion after a C–2 vacancy opened up in 1998. Training coordinator Robert Smyth resigned, and Williams had to pick up the slack by teaching extra adult education seminars for several months afterwards. At that time, a new employee came on board. Williams still had to teach more classes, but Castile kept the neophyte and Williams at the C–3 level.[15] Williams's supervisor, Charles Ingram, testified that Williams assumed more teaching responsibilities, but these were merely "additional projects of the same type that Smyth was already doing." Ingram added that Smyth's resignation "did not add to the list of duties on [Williams's]

---

10. Williams's Dep. at 152–54.

11. Pl.Ex. CC at 1.

12. Pl.Ex. BB at 1.

13. Castile Aff. ¶ 3.

14. Def.Ex. E.

15. Williams's Dep. at 117–21.

job description," and that Smyth had a license to certify trainers, while Williams did not.[16]

Williams's deposition contains the following exchange, which underscores his lack of qualification for the promotion:

Q: I'm trying to find out: You're at work on Monday, and you find out that Bob Smyth has resigned, what is different about your job the next day with him gone?

A: More work.

Q: You told me about doing his seminars.

A: That's the only difference. I mean, more work.[17]

Williams's lawsuit erroneously conflates additional workload with additional work responsibilities. While Williams may have been working harder in July 1999, his own testimony proves that he shouldered no additional responsibilities. In fact, Castile has never hired or promoted any management trainer to C–2.[18] There being no evidence that Williams met the criteria established for promotion, the court finds that he has not raised an inference of disparate treatment. *See Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 533 (11th Cir. 1992) (plaintiff "must show that he was qualified for the position in order to make out a prima facie case of discrimination.")

■ Even assuming that Williams was qualified for the promotion, he has not knocked down AIDT's contention that it denied his promotion because Castile believed that Williams had assumed no additional responsibility, and that no reorganizations justified promotion. An employer may act on the basis of "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."

*Chapman*, 229 F.3d at 1030 (quoting *Nix v. WLCY Radio*, 738 F.2d 1181, 1187 (11th Cir.1984)).

Williams unpersuasively attempts to undermine AIDT's decision by pointing to three facts: (1) Williams received compliments from his students and above-average reviews from his supervisors; (2) Williams took on additional workload after Smyth's resignation; and (3) in 1996 or 1997, Castile rejected a committee's recommendation to interview three finalists for a job. One of the finalists was black. Castile convened a new committee and chose a white employee instead.

■ These first two arguments are easily disposed. Nothing in Title VII requires an employer to promote an employee. Title VII solely outlaws employment decisions based on forbidden criteria. *See Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir.1988); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 403 (7th Cir.1992) ("[t]he fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination."). As explained earlier, Williams's additional workload is insufficient grounds for promotion under the Shuford Decree. Similarly, Williams's conclusory allegation that Smyth's resignation triggered a reorganization is jejune. Williams points to no management trainers who have ever been classified C–2, and the court will not second-guess AIDT's business judgments in this respect. *See Chapman*, 229 F.3d at 1030 (courts are not super-personnel boards and should not recast an employer's proffered reasons).

Finally, it is irrelevant that Castile rejected the personnel committee's recommendation to interview a black job appli-

---

16. Ingram's Dep. at 84–88.

17. Williams's Dep. at 121.

18. Castile Aff. ¶¶ 4–5.

cant in 1996 or 1997. This might be relevant if Williams was one of three finalists recommended for a position around 1997, and Castile deep-sixed the recommendation. But Williams has not connected any of Castile's previous actions to Castile's decision not to promote Williams, and courts "are reluctant to consider 'prior bad acts' in this context where those acts do not relate directly to the plaintiffs." *Denney v. City of Albany,* 247 F.3d 1172, 1189–90 (11th Cir. 2001); *Pelli v. Stone Savannah River Pulp & Paper Corp.,* 878 F.Supp. 1559, 1566 (S.D.Ga.1995) (disregarding other personnel decisions when plaintiff never "connected these decisions . . . with the decision not to hire her."); *Harrison v. Larue D. Carter Mem'l Hosp.,* 883 F.Supp. 328, 329 (S.D.Ind.1994), *aff'd,* 61 F.3d 905, 1995 WL 445691 (7th Cir.1995) (same). Moreover, Castile testified that he believed the 1997 interview process was flawed, and another AIDT administrator agreed. Williams has failed to rebut this proffer.

All in all, there is insufficient evidence of discrimination. Therefore, AIDT's Motion For Summary Judgment is due to be granted. *See Smith,* 839 F.2d at 1538 (arguments of pretext typically fail if candidate does not meet employer's hiring criteria).

## B. *Retaliation*

Williams also claims that AIDT terminated him in December 1999 in retaliation for filing the EEOC complaint in September. AIDT responds that Williams violated state ethics laws by repeatedly using a state vehicle for personal purposes, then attempting to conceal his misconduct. The court finds that no rational jury could find in Williams's favor; therefore, AIDT's Motion is due to be granted.

■■■ Williams establishes a prima facie case of retaliation. He filed an EEOC charge in September and was fired in December. The causal connection requirement is interpreted broadly; Williams merely has to prove that the protected activity and the negative employment action are not completely unrelated. A jury could infer retaliation, given that Williams worked for AIDT for six years, then was fired ten weeks after his complaint. *See Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir.1999).

■■■ AIDT then proffers a long list of legitimate reasons for firing Williams. The agency's guidelines state that vehicles may never be used for personal reasons and must always be logged out and in by employees. Unauthorized or improper use is grounds for termination, as is falsifying travel records.[19] Castile got word that another employee saw Williams with a state vehicle at a hospital on Sunday, December 5. Castile began an internal investigation and determined that: (1) Williams left AIDT in a state vehicle on Sunday, December 5 but did not sign the car out; (2) took leave to attend a doctor's appointment on Monday morning, December 6, and apparently drove the car to the appointment; (3) came into work later Monday morning and wrote down the wrong mileage when he logged the car out; and (4) deliberately concealed his use of the car. Basically, Williams did not log any of the personal miles driven on Sunday and Monday, and Castile felt this was dishonest.[20]

---

**19.** Def.Ex. K at 7–3; Pl.Ex. Z at 5–11. The grounds for termination listed in Exhibit Z are non-exhaustive.

**20.** Castile Aff. ¶ 7; Castile's Dep. at 209. Williams admits that he used the car for personal business on Sunday and Monday, and did not sign the car out. (Williams's Dep. at 97–99.)

■ Because the Alabama Department of Industrial Relations (ADIR) found that Williams was discharged for a "dishonest or criminal act in connection with his work," ALA.CODE § 25-4-78(3)(a) (1975), the doctrine of claim preclusion, perhaps, bars him from arguing that he did not commit these violations. *See Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999); *Wal-Mart Stores, Inc. v. Smitherman,* 743 So.2d 442, 444–48 (Ala.1999) (recognizing the preclusive effect of ADIR's decisions).

■ When an employer proffers several reasons for its action, an employee "must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman,* 229 F.3d at 1037 (citing *Combs,* 106 F.3d at 1543); *Daniel v. City of Lanett,* 2000 WL 1863485 at *3 (M.D.Ala.2000).

Williams attempts to show that AIDT's reasons are pretextual by asserting that: (1) Castile terminated Williams without following a certain portion of AIDT's policy manual; (2) an EEOC investigator found probable cause; (3) Castile proffered inconsistent reasons for his actions; (4) Castile gave Williams permission to use the car; and (5) an employee named Olga Harris engaged in similar misconduct but was not fired.[21] None of this evidence undermines AIDT's proffered reasons.

■ *Deviation from policy manual.* After finishing his investigation, Castile drafted a letter of resignation for Williams to sign. Castile then called Williams in for a meeting to discuss his findings. Williams contends that Castile intended to terminate Williams before even meeting with him, "thus violating the AIDT policy manual, which requires that 'employee terminations ... shall include due process in conformance with applicable State and Federal laws.'"[22] This argument fails on the facts, for Castile plainly stated that when he wrote the letter, he was unsure whether he would terminate Williams, accept his resignation, or take no action at all.[23]

■ Moreover, "[n]either sections 1981 and 1983 nor Title VII makes an employer liable for simply erroneous or arbitrary decisions." *Friedel v. City of Madison,* 832 F.2d 965, 973 (7th Cir.1987). The issue is whether the employer misapplied the policy in a disparate manner with an invidious intent. Without evidence that the policy manual's "due process" section was ever followed in the first place, much less enforced in a disparate manner, Williams's argument is doomed. *See Mitchell v. USBI Co.,* 186 F.3d 1352, 1355–56 (11th Cir.1999); *Berg v. Florida Dep't of Labor & Emp't Sec.,* 163 F.3d 1251, 1255 (11th Cir.1998).

■ *EEOC findings.* Between 1996 and 1999, Williams saw the doctor 28 times on Monday mornings. Castile fired Williams, in part, because he took a state car to the doctor's office on Monday, December 6. No evidence suggests that Castile knew that Williams may have used the car to see the doctor on prior occasions.[24]

---

21. Williams also contends that he was placed under heightened surveillance. The facts set forth in AIDT's Reply brief prove otherwise. (Reply at 24–25.)

22. Resp. at 25 (quoting Pl.Ex. Z at 5–11); Castile's Dep. at 206.

23. Castile's Dep. at 208.

24. Castile states that he deduced that Williams took the car to the podiatrist on Monday. (Castile's Dep. at 188.) This evidence does not show that Castile somehow ratified the fact that Williams used a state car to go see the doctor. Williams, in fact, stated that Castile told him not to use the car for personal business when he was in town. (Williams's Dep. at 208–09; Castile Aff. ¶ 6.)

Nevertheless, because Williams's firing came on the heels of his EEOC complaint, an EEOC investigator found cause to believe that Williams was the victim of retaliation.[25] In his Response, "Williams asserts that the EEOC determination alone creates a genuine issue of material fact . . .".[26] The court disagrees.

■ Article III of the Constitution vests the judicial power in judges appointed by the President and confirmed by the Senate. EEOC investigators usually are kindly people. But there should be no confusion that they cannot usurp the judiciary's role in determining whether there is a genuine issue of material fact. *See Dickerson v. Metro. Dade County,* 659 F.2d 574, 579 (5th Cir.1981)[27] ("in Title VII litigation, the district court reviews the evidence de novo, independent of any determination by the EEOC"); *Bynum v. Fort Worth Indep. Sch. Dist.,* 41 F.Supp.2d 641, 658 (N.D.Tex.1999) (finding that EEOC's determination may be considered to see "if the EEOC had evidence of discrimination that was not in the summary judgment record," but "not as primary evidence of the truth of the contents of the record").

The court cannot determine what evidence the investigator considered before making his findings, but the reasonable cause letter suggests that EEOC was not fully informed of Williams's prior work history or Castile's ignorance of Williams's use of the car. The court finds that the letter is suitable for framing but does not create an issue of fact.

■ *Inconsistent reasons.* Williams next tries to undermine Castile's credibility by pointing to some inconsistencies in Castile's testimony. On two separate occasions, Castile falsely stated that an AIDT employee saw Williams at the hospital on Monday. There was no such sighting, and Castile later admitted as much. But this means little to the court. Employment law is not a game of "Gotcha!" "[P]retext means a lie, specifically a phony reason for some action." *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1261 (11th Cir.2001). Williams confessed that he took the car to the hospital,[28] and the lack of eyewitness testimony does not change this fact. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Brown v. American Honda Motor Co.,* 939 F.2d 946, 953 (11th Cir.1991) (quoting *Anderson,* 477 U.S. at 247–28, 106 S.Ct. 2485); *see also Stone v. Galaxy Carpet Mills, Inc.,* 841 F.Supp. 1181, 1187 (N.D.Ga.1993) ("an employer need not expatiate at length its reasons for an employment decision . . . in order to avoid later Title VII liability.")

■ Castile also wrote a memo stating that Castile told Williams that he fired or obtained resignations from everyone known to have used state cars for personal purposes.[29] Williams then claims that three other employees committed such infractions but were not fired: Larry Morrow, Shannon Cloman, and Olga Harris. But this evidence is insufficient to show pretext.

No evidence shows that Morrow or Cloman used state cars wrongly. Morrow's job entails running errands and taking

---

**25.** Def.Ex. U.

**26.** Resp. at 20.

**27.** The Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*See Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**28.** Williams's Dep. at 223.

**29.** Def.Ex. J.

cars to the shop for repairs. Williams testified that he saw Morrow's car at Hardee's and auto shops on weekdays. Williams asserted that Morrow was on personal business, but admitted that he has no personal knowledge of this fact. He offered no support for his assertion besides hearsay. Williams's statements about Cloman are similarly conclusory. Castile, on the other hand, produced affirmative evidence that AIDT allowed employees to stop for lunch while working, and that Castile had no knowledge that Morrow or Cloman allegedly used the car for personal reasons.[30] Without such knowledge, Castile's statements must be taken at face value. *See Dent v. Federal Mogul Corp.,* 129 F.Supp.2d 1311, 1314 (N.D.Ala.2001) ("it is not enough to show that other employees engaged in the same or similar misconduct but were never disciplined simply because they were not caught.") Moreover, "mere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment," *Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir.1984), and courts must never rely on hearsay, *see Macuba v. Deboer,* 193 F.3d 1316, 1322–25 (11th Cir. 1999) ("the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.") *Id.* at 1323. Thus, Williams may not avail himself of the evidence regarding Morrow and Cloman. The court discusses Castile's treatment of Harris below.

*Permission to use the car and comparative evidence.* Williams's final two related arguments are his strongest. First, Williams states that Castile did not precisely delineate AIDT's policy against using state vehicles for personal purposes.

In his attempt to show retaliation, Williams also points to Castile's treatment of Harris, who used a state car inappropriately but was not fired. This evidence, however, is not enough.

 Williams does not contest that Castile reprimanded him in February 1999 for using state vehicles.[31] Both parties, however, dispute the extent of the warning. Castile says that he told Williams "that under no circumstances was the state vehicle to be used for in town travel or travel that was unrelated to work." Williams says that Castile told him that he could pick up a state van on Sunday, take it back to his house and fill it to the brim with teaching materials. Williams gave whistlestop presentations all over south Alabama, and this arrangement helped him get a jump on the day.[32]

The court accepts Williams's testimony as true, of course. But the court rejects any argument that Williams had permission to use the car for a host of purposes that were not reasonably linked to getting out the door early on Monday. Even Williams admits that he knew that such incidental use had to be tied to a legitimate business purpose, beneficial to AIDT.[33] As Williams testified:

Q: Now, Joe, was there a business purpose that benefitted the AIDT program when you took the State vehicle to your home on a Sunday evening?

A: The benefit to AIDT was that it allowed me the opportunity to gather what I thought ... I never considered it a vehicle. I considered it to be part of my training packet. And I organized all of my materials.

---

**30.** Castile Aff. ¶ 11; Castile's Dep. at 158–59; Williams's Dep. at 91–94.

**31.** Williams's Dep. at 84; Def.Ex. D.

**32.** Castile Aff. ¶ 6; Williams's Dep. at 84–86, 109.

**33.** Williams's Dep. at 208–10.

I would go out and check my materials at night. So it facilitated me doing my job by having it with me.... [34]

Williams asserts that Castile used the policy as a tool for retaliation. Castile fired Williams for his personal use of the car, but Castile said he allows people to drive for lunch at a place that is "reasonably close," or stop at the dry cleaners if it is right around the employee's normal driving route. Williams complains that this unofficial policy is pretextual because Castile could not define precisely how close is "reasonably close," and such a definition was not written down anywhere.[35]

But Congress does not force employers to amass an encyclopedic collection of rules that are known throughout the shop. When an employee like Williams understands the general thrust of an unwritten work rule, decisions based on the rule are not pretextual absent concrete evidence that the rule was used as a mask for retaliation. The court need not determine the precise boundaries of AIDT's policy against personal use of a vehicle in order to find that Williams's actions fell on the side that is prohibited. *See J.A. Beaver, Inc. v. Rayonier, Inc.*, 200 F.3d 723, 729 n. 2 (11th Cir.1999) ("we decline to adopt a rule that a plaintiff can establish pretext merely by showing the employer did not place the reasons that factored into its termination decision in writing."); *Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir.1991) ("[w]hether a policy is written or unwritten has minimal probative value on the issue of pretext."); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (recognizing that most workplaces have some "common

law of the shop"). *But cf. Dunning v. National Indus.*, 720 F.Supp. 924, 931 (M.D.Ala.1989) ("unwritten policies, as opposed to written policies, can be easily turned into tools of discrimination.")

Put another way, Williams must meet AIDT's reasons head on and rebut them. He cannot discharge his burden by nibbling around the edges. Williams did not go to a dry cleaners or go to lunch while he was at work. Williams picked up the state vehicle on a Sunday afternoon, even though he was not leaving town until Monday morning. He drove to a local hospital to see a friend, and then to two fast food restaurants for purely personal reasons. The next morning, he went to the hospital a second time to get with a foot doctor. Then he went to check up on some workers remodeling his home. Then he went to work. Williams has not shown that the hospital, the eateries, or his home are located even remotely close to any place where he would go to further AIDT's interests. *See Chapman*, 229 F.3d at 1032 n. 22.

Nor has he shown that others used state vehicles similarly but were not disciplined. For comparison purposes, "the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Silvera*, 244 F.3d at 1259–60 (quoting *Maniccia*, 171 F.3d at 1368). In *Silvera*, the Court held that an employee arrested for DUI and sexual abuse of a child was not similarly situated to the plaintiff, who had three arrests for violent assaults in addition to his arrest for sexual abuse of a child. Though both employees were child molesters, the comparator was dissimilar because DUI is not a violent offense, and the DUI occurred earlier in

---

34. *Id.* at 209.

35. Resp. at 22; Castile's Dep. at 153–59; Ingram's Dep. at 61–66.

time than the plaintiff's most recent arrest. *See id.* at 1259–60.

■ Harris is not a proper comparator. Williams observes that Castile did not terminate Harris, even though Harris got in a wreck when she improvidently drove a state car to Auburn University to visit her daughter.[36] But Williams does not contend that Harris also wrote down the car's mileage inaccurately and chose not to log out the car. Also, this was Harris's first and only offense of state ethics policies, and so Castile issued a reprimand and made Harris pay AIDT for the mileage.[37]

On the other hand, Williams was a two-time offender. Moreover, AIDT fired recidivist Williams for: (1) his automotive detours; (2) not following proper procedures for signing for the car; and (3) logging the mileage incorrectly the next work day. On these facts, the court finds no evidence of retaliatory intent. *See Nix,* 738 F.2d at 1186 ("[i]f an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown.") Accordingly, AIDT's Motion is due to be granted. *See Eldridge v. Morrison,* 970 F.Supp. 928, 936 (M.D.Ala.1996), *aff'd,* 120 F.3d 275 (11th Cir.1997); *Pollard v. Montgomery County,* 66 F.Supp.2d 1218, 1228–30 (M.D.Ala. 1999); *see also Chapman,* 229 F.3d at 1036 (upholding grant of summary judgment when employee's Response brief did not address all of employer's proffered reasons for its action).

## V. ORDER

It is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED. All other outstanding motions be and the same are hereby DENIED AS MOOT. The Clerk of Court shall close this case. A judgment follows.

---

**36.** Castile's Dep. at 176–77.

**37.** Resp. at 7–8, 26–27.