Sylvester SMITH, Plaintiff,

v.

State of ALABAMA, Defendant.

No. CIV.A. 01–F–1396–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 19, 2003.

1318

alleging claims of race discrimination and retaliation pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* (hereinafter "Title VII") and 42 U.S.C.1981 (hereinafter "Section 1981").[1] On January 15, 2002, Defendant, State of Alabama (hereinafter "State") filed an Answer (Doc. # 7).

This action is presently before the court on the motion for summary judgment filed by the defendant on January 8, 2003 (Doc. # 23) and the motion to strike portions of the plaintiff's affidavit filed by the defendant on February 27, 2003 (Doc. # 46). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court concludes that the motion for summary judgment is due to be GRANTED and the motion to strike is due to be DENIED as moot.

## I. FACTS [2] AND PROCEDURAL HISTORY

### A. *Employment Background*

Plaintiff, an African–American, was employed with the Alabama Department of Human Resources (hereinafter "DHR") for twenty-four years. He was hired in 1977 as a Social Worker, and ten years later was promoted[3] to the position of Equal Employment Opportunity (hereinafter "EEO") Coordinator. Plaintiff retained the EEO Coordinator position until he retired from DHR in April, 2001.

As an EEO Coordinator,[4] Plaintiff had the responsibility to ensure that the entire DHR complied with Title VII, Section 1981, and other federal employment discrimination statutes and regulations.

Taffi S. Stewart, Spain & Gillon, L.L.C., Marvin L. Stewart, Jr., James Albert Barnes, IV, The Stewart Law Group, P.C., Birmingham, AL, for Sylvester Smith, plaintiff.

Constance S. Barker, Capell Howard PC, Sharon E. Ficquette, Sharon E. Ficquette, Alabama Department of Human Resources, Legal Office, Montgomery, AL, for State of Alabama, defendant.

### *MEMORANDUM OPINION AND ORDER*

FULLER, District Judge.

Plaintiff, Sylvester Smith, filed a Complaint (Doc. # 1) on November 29, 2001,

---

1. On January 23, 2003, the court dismissed Plaintiff's Section 1981 claims (Doc. # 27).

2. This recitation of "facts" is based upon materials presented by the parties, viewed in the light most favorable to the plaintiff.

3. At the time of this promotion, Plaintiff was a Welfare Supervisor II (Doc. # 24, Ex. 29).

4. Plaintiff was one of five (and later four) other EEO Coordinators employed by different state agencies.

Moreover, DHR had a policy which required any employee, who had concerns that he may be a victim of unlawful discrimination, to file a complaint with DHR to allow it to promptly investigate the complaint and take prompt remedial action, if warranted. As an EEO Coordinator, Plaintiff also had the responsibility to enforce this policy by conducting investigations and making appropriate recommendations for remedial action.

According to Plaintiff, in previous discrimination investigations,[5] he made findings that P.L. Corley (hereinafter "Corley"), Deputy Commissioner of Finance and Acting Personnel Director, engaged in race discrimination and retaliation.[6] Plaintiff complains that "as a result of these findings" he was subjected to discriminatory retaliation by Corley and Tony Petelos (hereinafter "Commissioner Petelos"), the former Commissioner of DHR[7] (Doc. # 41). Plaintiff's specific complaints of racial discrimination and retaliation are addressed below.

**B. Alleged Acts of Racial Discrimination and Retaliation**

According to Plaintiff, he was subjected to the following various discriminatory acts: (1) wrongful denial of Plaintiff's "opportunity to be considered and chosen for the Director of Personnel position," (2) wrongful denial of "equal and fair access to the 1999 salary study," (3) "retaliation relative to the salary increase that the 1999 Classification and Compensation survey had determined was appropriate for EEO Coordinators," (4) retaliation regarding the denial of "secretarial assistance," and (5) "several specific instances of retaliation" by Commissioner Petelos (Doc. # 41, pp. 4, 11–12–20, 22–26).[8] The facts for each of these alleged discriminatory acts are set forth below.

**1. Director of Personnel Position**

In the fall of 1998, Waldo Spencer, a Personnel Manager III (hereinafter "PM

5. Plaintiff avers that, in a previous discrimination investigation conducted in early 1999, he investigated disability discrimination complaints from an employee named "Ms. Thomas." According to Plaintiff, in the Thomas case, he "reached the conclusion that Ms. Thomas was treated differently because of her race by [Corley] in comparison to a similarly situated white employee" (Smith Aff.). Plaintiff also contends that during another discrimination investigation, Plaintiff found that Corley had retaliated against another employee, Doris Howard (hereinafter "Howard") (Smith Aff.). Howard filed her complaints of race discrimination against Corley in November 1998 and July 1999 (Corley Aff., ¶ 12).

6. In the Pretrial Order, Plaintiff alleges that Corley "issued threats of retaliation involving future promotions, terminations and making life difficult for the findings [Plaintiff] had made that Corley personally had engaged in discrimination." Pretrial Order, p. 4.

7. Petelos was the Commissioner of DHR from December 1997 to June 2000 (Doc. # 24, Ex.

A, Petelos Aff.). He was replaced as Commissioner of DHR by Bill Fuller.

8. Although Plaintiff alleged pay discrimination and disparate treatment claims as count two and count three in his Complaint, these claims were not included in the pretrial order. Accordingly, the court concludes that Plaintiff has abandoned these claims. Fed. R.Civ.P. 16(e). *See also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1301, 1326 (11th Cir.2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned). *Cf. McMaster v. United States,* 177 F.3d 936, 940–41 (11th Cir.1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir.1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.").

III"), retired. In July of 1998, prior to the effective retirement date, DHR posted notice of the vacancy for any eligible employees who were interested in transferring to the PM III position. Although Plaintiff submitted his name for consideration, he was not transferred or promoted to this position. Instead, on December 4, 2000, Commissioner Bill Fuller (hereinafter "Commissioner Fuller") appointed Thomas King (hereinafter "King") to the position of PM III.

As a result, Plaintiff brings a wrongful denial of promotion claim against the State and avers that he was "denied the opportunity to be considered and chosen for the Personnel Manager III position in the fall of 1998" (Pretrial Order). Plaintiff concludes that he was wrongfully denied this position "because of his prior findings that [Corley] had engaged in race discrimination and retaliation" (Doc. # 42, p. 9).

### 2. 1999 Salary Study

During the last ten years, the State Personnel Department (hereinafter "SPD") conducted two separate salary studies[9] of Plaintiff's job classification- EEO Coordinator. The studies were conducted by analyst Tonia Stephens (hereinafter "Stephens"), an African–American female, in 1996 and 1999 (Doc. # 24, Ex. D). In 1996, Stephens collected and compiled data[10] on the duties and responsibilities of each EEO Coordinator, and sent the data to the various southeastern states. The data received confirmed that Alabama paid an average or above average salary for the duties and responsibilities of an EEO Coordinator. As a result, Stephens determined that no changes in the EEO Coordinator salary were warranted and SPD made no recommendation to upgrade the salary.

In 1999, acting in response to a request from several appointing authorities, Stephens conducted another salary survey of the EEO Coordinator position (*Id.*). Because SPD retained the detailed data that each EEO Coordinator submitted in 1996, Stephens did not repeat that specific step of the process; rather she updated the information and again surveyed the southeastern states. On this occasion, the data received from other states indicated that Alabama's salary had dropped slightly lower than average in the maximum salaries paid. As a result, Stephens and SPD recommended a substantial upward salary adjustment from pay grade 76 ($33,920— $54,415) to 79 ($39,229—$59,753) for the EEO Coordinator classification. The SPB approved the recommendation and the Governor gave final approval on August 18, 1999 (Doc. # 24, Ex. 21).

Plaintiff contends that the State denied him and the other EEO Coordinators equal and fair access to the 1999 salary study by not allowing them to provide "input" into the study (Doc. # 41, ¶ 50). Plaintiff concludes that "[Corley] denied [him] access to the study because of the prior findings of race discrimination and retaliation that the plaintiff had made

---

9. When a salary study is conducted, SPD collects information about the duties and responsibilities of the particular job and sends the information to other states in the southeast. The data received from the various states is compiled and compared. If the data reflects that Alabama pays below average in the southeast, SPD will recommend an upward salary adjustment. If it does not, SPD does not recommend any upward adjustment in the salary upgrade. Any such recommenda-

tion by SPD is then presented to the State Personnel Board (hereinafter "SPB"). If SPB approves the recommendation, the recommendation is forwarded to the Governor for final approval (Doc. # 24, Ex. D, ¶ 11–12).

10. This data was submitted by each of the members in the EEO Coordinator classification, including Plaintiff, and contained detailed information regarding their duties and responsibilities.

against him" and because all of the EEO Coordinators were African–American (Doc. # 41, ¶ 51; Pretrial Order).

### 3. Salary Increase

After the Governor approved the salary upgrade for all EEO Coordinators in August 1999, DHR failed to send in a request for immediate implementation of Plaintiff's salary increase (Corley Aff., ¶ 5). In January 2000, Plaintiff brought this issue to Corley's attention and Corley immediately sent a memoranda to SPD requesting an immediate salary increase for Plaintiff retroactive through September 1999 (*Id.* at ¶ 6). SPD advised Corley that Plaintiff's increase could be paid retroactive to October 1, 1999, but that there was no authority for the September 1999 payment (*Id.*). Notwithstanding, Corley learned that Plaintiff could receive the retroactive September 1999 salary increase through the Board of Adjustment (hereinafter "BOA") (*Id.*). In turn, on August 22, 2000, Corley consented to a BOA judgment against DHR in the amount of Plaintiff's September 1999 salary increase ($171.14) and Plaintiff was paid that amount through the BOA (*Id*).

Plaintiff contends that he was "subjected to retaliation relative to the salary increase that the 1999 [salary survey] had determined was appropriate for EEO Coordinators" (Doc. # 41, ¶ 54). According to Plaintiff, after the 1999 salary study decision had been rendered, Commissioner Petelos and Corley denied his request to draft a letter to Tommy Flowers (hereinafter "Flowers"), Director of SPD, to seek his salary increase (Doc. # 41, ¶ 55).

Plaintiff therefore concludes that DHR "refused to assist him" in receiving his salary increase.

### 4. Denial of Secretarial Assistance

Plaintiff also complains that he was subjected to discriminatory retaliation "through efforts of [Corley] to make it more difficult for the plaintiff to perform his job" (Doc. # 41, ¶ 61). Plaintiff alleges that Corely denied secretarial assistance to Plaintiff by approving the transfer of Plaintiff's secretary to the office of another employee (*Id.* at ¶ 63).[11] The transfer left Plaintiff without a secretary and Corley denied Plaintiff's request to replace the secretary until a letter of race discrimination was filed (*Id.* at ¶ s 64, 65).

### 5. Retaliation by Commissioner Petelos

Plaintiff complains of several specific instances of retaliation by former Commissioner Petelos. First, Plaintiff complains that Commissioner Petelos verbally assaulted Plaintiff for his investigation findings that Corley and other DHR officials had engaged in race discrimination and retaliation. Second, Plaintiff complains that "on one occasion," Commissioner Petelos intentionally sought to humiliate Plaintiff in front of his staff.[12] Third, Plaintiff complains that Commissioner Petelos "in conjunction with [Corley]" intentionally refused to select Plaintiff to fill the vacancy for the position of PM III (Doc. # 41, ¶ 77). Fourth, Plaintiff complains that Commissioner Petelos accused Plaintiff of failing to perform his job in

---

11. Christine Thorn, Plaintiff's former secretary, was transferred to another office in October 1998 (Thorn Aff., p. 8).

12. Specifically, Plaintiff complains:
 On that occasion, the plaintiff's section had just hired a black civil rights analyst. The plaintiff asked [Commissioner Petelos] in

front of his staff during an office visit, which office should be used [for] the new analyst since they were short of office staff [sic]. [Commissioner] Petelos instructed the plaintiff to place the incoming civil rights analyst in a closet as his work space. (Doc. # 41, ¶ s 73–77).

investigating complaints filed by Caucasian employees (*Id.* at ¶ 79).

### C. Procedural History

Plaintiff filed a written charge with the Equal Employment Opportunity Commission (hereinafter "EEOC") on August 18, 1999, alleging race discrimination and retaliation (Compl., Ex. 1).[13] The EEOC issued a Notice of Right to Sue Letter on September 12, 2001 (Compl., Ex. 2).

On November 29, 2001, Plaintiff timely filed this Title VII action alleging race discrimination and retaliation (Doc. #1,

Compl.). Plaintiff seeks compensatory damages; injunctive relief, including back-pay; attorney's fees; and costs (Doc. #1, Compl).

On January 8, 2003, the defendant filed a motion for summary judgment. Plaintiff filed his response to the motion on February 13, 2003 (Doc. #26), and on January 16, 2003, Defendant filed a reply (Doc. #29).

## II. JURISDICTION AND VENUE

██ The court exercises subject matter jurisdiction[14] over this action pursuant to

---

**13.** In his EEOC charge, Plaintiff alleges that the following parties discriminated against him: Alabama Personnel Department; Tommy G. Flowers, State Personnel Director of the State of Alabama Personnel Department; Tony Petelos, Commissioner and his predecessors and Acting Predecessors of the Alabama Department of Human Resources; Jackie Graham, State Personnel Deputy Director of the State of Alabama Personnel Department; Parris L. Corley, Acting Personnel Director of the Alabama Department of Human Resources; Joel Dickson, Harry McMillan, John McMillan and J. Ray Warren, State Personnel Board Members of the State of Alabama Personnel Department; Halycon Vance Ballard, Former State Personnel Director of the State of Alabama Personnel Department; and Waldo Spencer, Former Personnel Director of the Alabama Department of Human Resources.

**14.** The State summarily argues that this court lacks subject matter jurisdiction because Plaintiff cannot assert Title VII claims against the State of Alabama. The State argues that it is a "non-employer" (Doc. #24; Pretrial Order), and contends that DHR and the State are not a "single employer" under Title VII. The State concludes that Plaintiff's Title VII claims must be dismissed for lack of subject matter jurisdiction (Doc. #24; Pretrial Order).

This court is not persuaded by the State's argument. It is well-established that "the 1972 [Title VII] amendments contained the requisite unequivocal expression of congressional intent to abrogate the States' sovereign immunity as to Title VII claims generally." *Reynolds v. Alabama Dep't of Transp.,* 4 F.Supp.2d 1092 (M.D.Ala.1998). *See Fitz-*

*patrick v. Bitzer,* 427 U.S. 445, 452, 96 S.Ct. 2666, 49 L.Ed.2d 614 (observing that "the 'threshold fact of congressional authorization' ... to sue the State as employer is clearly present."). Hence, the State of Alabama is not a "non-employer" but, indeed, is a governmental entity which is subject to suit under Title VII.

Moreover, under Title VII, an "employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..." 42 U.S.C. § 2000e(b). "Employee" is defined as

> an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political sub-division.

42 U.S.C. § 2000e(f). In this case, the State has presented no evidence which indicates that it does not satisfy Title VII's definition of an "employer," that Plaintiff fails to satisfy Title VII's definition of an "employee," nor that Plaintiff fails to qualify as an employee of the State. Correspondingly, the "single-employer" test is inapplicable because said test

28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. §§ 2000e to 2000e–17 (Title VII of the Civil Rights Act of 1964 as amended). The parties contest neither personal jurisdiction nor venue.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[15] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant either by submitting affirmative evidence negating an essential element of the nonmovant's claim or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to its claims, and on which it bears the burden of proof at trial. To satisfy this burden, the nonmovant cannot rest on its pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). If the nonmoving party does not respond to a motion for summary judgment, the court may grant a motion for summary judgment in favor of the moving party, if defendant's presentation is sufficient to justify the court's conclusion. *Id.*

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987). It is substantive law that iden-

---

is applied for the purpose of counting employees. *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332 (11th Cir.1999) (established test for determining whether "two or more state or local governmental entities" should be aggregated and treated as a "single Title VII 'employer'" for the purpose of counting employees); *also Owens v. Southern Dev. Council, Inc.*, 59 F.Supp.2d 1210 (M.D.Ala. 1999); *Laurie v. Alabama Court of Criminal Appeals*, 256 F.3d 1266 (11th Cir.2001). As the State has not presented any evidence regarding its failure to satisfy the "fifteen employees" requirement, there is no need for the court to count or aggregate employees. Accordingly, as the State has failed to present evidence in support of its argument, the court finds that this argument is without merit.

**15.** The Supreme Court explained that:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted).

tifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also De Long Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V/ Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Consideration of a motion for summary judgment does not lessen the burden on the nonmoving party, i.e., the nonmoving party still bears the burden of coming forth with sufficient evidence on each element that must be proved.[16] *Earley,* 907 F.2d at 1080. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## IV. DISCUSSION

### A. Title VII Standards

Title VII prohibits an employer from discriminating against its employees on the basis of race. 42 U.S.C.A. § 2000e–2(a)(1).[17] In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the allocation of the burden of production and an order for the presentation of proof in discrimination and retaliation cases. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful race discrimination or retaliation by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. 1817. A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory [or retaliatory] criterion." *International Broth. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

The Eleventh Circuit has explained that, for the usual disparate-treatment

---

**16.** "[I]f on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, ... [the court must] grant summary judgment [for the defendant]." *Earley,* 907 F.2d at 1080 (citations omitted). In *Earley,* the Court of Appeals further emphasized:

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

\* \* \* \* \* \*

If the evidence is "merely colorable, or is not significantly probative, summary judg-

ment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted) (emphasis added); *accord Hudson v. Southern Ductile Casting Corp.,* 849 F.2d 1372, 1376 (11th Cir.1988). *Earley,* 907 F.2d at 1080–81.

**17.** Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

case where direct evidence is not present, "a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1561–62 (11th Cir.1997) (citations omitted). Similarly, in order to establish a prima facie case in a failure to promote claim, the plaintiff must prove the following four elements: (1) that he belongs to a protected class; (2) that he was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group. *See Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir.1998); *Williams v. Ala. Indus. Dev. Training,* 146 F.Supp.2d 1214, 1219 (M.D.Ala.2001).

 The Eleventh Circuit has established similarly broad standards for a prima-facie case of retaliation. An individual alleging retaliation under Title VII must establish his prima-facie case by demonstrating "(1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir.1998) (citations omitted). "The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville,* 261 F.3d 1262 (11th Cir.2001) (citations omitted).

 If the plaintiff establishes a prima-facie case of racial discrimination or retaliation, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-discriminatory or non-retaliatory reasons for its employment action. *Holifield,* 115 F.3d at 1564. "This intermediate burden is 'exceedingly light.'" *Id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 253–255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Once the employer satisfies this burden of production, "the presumption of discrimination [or retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (citations omitted). The establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. Sys.,* 701 F.2d 1383, 1389 (11th Cir.1983). After an employer proffers non-discriminatory or non-retaliatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered ... reasons is pretextual." *Chapman,* 229 F.3d at 1037.

For the purposes of this motion for summary judgment, the court assumes that Plaintiff has established prima-facie cases

of racial discrimination and retaliation in all but three instances,[18] and focuses its analysis on two issues: first, the court considers whether the State has met its burden to articulate non-discriminatory or non-retaliatory reasons for actions at issue. Second, the court considers whether Plaintiff has produced sufficient evidence to conclude that the State's proffered reasons are pretextual. Where Plaintiff plainly cannot establish his prima-facie case, the court has so noted.

### B. Plaintiff's Claim of Race Discrimination

Plaintiff alleges two claims of race discrimination: (1) wrongful denial of a transfer or promotion to the PM III position, and (2) wrongful denial of equal and fair access to the 1999 salary study (Pretrial Order). The court addresses each of these allegations in turn.

### 1. PM III Position

██ Under Alabama law, a merit system position, such as PM III, can be filled by a lateral transfer of a merit system employee who is employed in that same job classification, but is employed by a different State department or agency. Ala.Code § 36–26–24 (1975).[19] If the de-

partment that has the vacancy and the department where the employee is currently employed, agree to a transfer, the employee could be laterally assigned to the new position. *Id.* The evidence before the court indicates that Plaintiff was not employed in the PM III classification, and thus, was not eligible or qualified for a lateral transfer. In fact, Plaintiff specifically testified in his deposition that he was not eligible for a lateral transfer into the PM III position (Smith Dep., p. 497). Accordingly, this court concludes that Plaintiff has not established a prima-facie case of discrimination for the State's failure to transfer him to the PM III position because he failed to establish that he was qualified to transfer to that position. For this reason, the State is entitled to summary judgment on this claim.

██ Further, there is no evidence which indicates that the State's legitimate, non-discriminatory reasons for not promoting Plaintiff to the PM III position are pretextual. In July of 2000,[20] Fuller replaced Petelos as Commissioner of DHR and began the process of appointing a PM III. Under Alabama law and the State Merit System Act, the Commissioner has the option of appointing from one of two "registers"[21] of qualified employees a "pro-

---

**18.** These three instances, which are further discussed, are: (1) wrongful denial of a transfer to the PM III position, (2) specific instances of retaliation by Commissioner Petelos, and (3) the denial of DHR assistance in receiving the 1999 salary increase.

**19.** Ala.Code § 36–26–24 (1975) provides:

An appointing authority may, at any time, assign a classified employee under his jurisdiction from one position to another in the same class. Any classified employee may be transferred from one department to another in the same class; provided, that the director shall have authorized the transfer and shall have received the approval of both appointing authorities concerned. In every case involving transfer, the appoint-

ing authority shall submit a written request to the director.

**20.** The State presents evidence that it delayed in filling the PM III position to save funds. During the 1998–1999 time period, the department was operating on a restricted budget (Petelos Aff., ¶ 6). The PM III position was one of the highest paid positions in the department, so the department opted to delay filling the position to save funds. *Id.* The Deputy Commissioner, who supervised the PM III and the personnel department, volunteered to perform the PM III duties in addition to his own duties, until the department was ready to fill the position. *Id.*

**21.** Both of these registers for the PM III position had been closed to new applicants for a

motional" register[22] or an "open competitive" register.[23] Ala.Code § 36–26–1 *et seq.* (1975).[24] Commissioner Petelos and Corley opted for the "open competitive" register instead of the "promotional" register because the "open competitive" register allowed an opportunity for non-State employees to be considered (Corley Aff., ¶ 5). As a result, Commissioner Petelos and Corley received a certificate of eligibles from the SPD, which listed twelve candidates who were "reachable" or had one of the top ten scores (*Id.* at ¶ 6).[25] Plaintiff was not one of these twelve "reachable" candidates (Graham Aff., ¶ 19). Consequently, as Plaintiff conceded in his deposition, DHR was prohibited from considering his application (Smith Dep., p. 499).

Here, Plaintiff argues that the State determined who was on the "promotional" and "open competitive" registers, prior to exercising its option to select a register,[26] so that it could avoid choosing him.[27] Specifically, Plaintiff argues that Corley engaged in this "canvassing" action and chose the "open competitive" register as opposed to the "promotional" register to avoid selecting him for the PM III position. This claim may or may not be valid, but the issue here is not whether the State engaged in "canvassing," which may or may not be illegal.[28] The issue here is whether the State engaged in illegal racial discrimination.[29]

Here, the State has met its burden to refute the inference of discrimination in selecting the "open competitive" register.

---

number of years (Corley Aff., ¶ 4). The evidence indicates that Flowers and Corley discussed the possibility of re-opening the registers by calling for a new examination (Corley Aff., ¶ 4). However, this re-opening would have opened the register to new applicants, and there were still a number of viable candidates on both registers so that there did not appear to be justification for a new examination (*Id.*).

**22.** The "promotional" register is limited to State employees who hold positions that are considered feeder positions for the job.

**23.** The "open competitive" register, on the other hand, is open to all qualified candidates, not just State employees.

**24.** When the Commissioner calls for a register, whether it is the "open competitive" register or the "promotional" register, he cannot return that register if there is an available African–American candidate among the list of candidates (Graham Aff., ¶ 18).

**25.** Under the State Merit System Act, an examination is administered and graded, and the applicants' names are placed on the register in order of their grades, with the highest grade number listed at the top of the list. Ala.Code § 36–26–15; (Doc. # 24, Ex. 27). Only the top ten scoring applicants are eligi-

ble for appointment or are "reachable" on the register (Doc. # 24, Ex. B, ¶ 6).

**26.** Plaintiff asserts that this impermissible preview of the registers is termed "the practice of canvassing" (Pretrial Order, p. 5).

**27.** Plaintiff was listed on both registers, however he did not have very high scores. Nonetheless, the evidence indicates that Plaintiff was "reachable" on the "promotional" register and, if DHR had elected to appoint from that register, DHR *could* have appointed Plaintiff to the PM III position. There were, however, six candidates who scored higher than Plaintiff and two of those six were African–American females.

**28.** In Plaintiff's Response to the Motion to Strike Portions of Affidavit (Doc. # 55), Plaintiff asserts that Flowers testified that "the practice of 'canvassing' the registers has been abolished at the Alabama Department of Transportation because of the opportunity for discrimination that 'canvassing' provides" and cites pages twenty-one, twenty-two and twenty-three of Flowers' deposition transcript. Flowers' deposition transcript, however, is not in evidence before this court.

**29.** Of course, if there were evidence that the State's practice of "canvassing" occurred and had a discriminatory application, the court would have to look further into the State's actions, but there is no such evidence.

It is clearly a legitimate business decision to choose a list of candidates who are not already employed in the state departments over a list of candidates who are employed there. As Corley averred, he came into his state employment position from the military, and thus considers experience outside of State employment to be very valuable (Corley Aff., ¶ 5). Accordingly, the court is not in the position to second-guess the decisions made by employers in the course of their business. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). It is well-established that the federal courts should not serve as "super-personnel department[s] that reexamine[ ] an entity's business decisions." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.2000) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)). Hence, with the State articulating a non-discriminatory reason for its decision, the burden shifts back to Plaintiff to demonstrate that this stated reason was a pretext for racial discrimination.

To prove his claim of racial discrimination, Plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered non-discriminatory reasons is pretextual. Plaintiff, however, has failed to produce *any* evidence for a reasonable factfinder to conclude that the State's proffered reason for selecting the "open competitive" register is pretextual. *See Chapman, supra.* ("[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual."). Further, Plaintiff has offered no evidence to show that such "canvassing" of registers even occurred in this case.[30] Instead, Plaintiff has merely presented unsubstantiated assertions

---

30. In his response to the motion to strike portions of his affidavit (Doc. # 55), Plaintiff asserts that "[Howard] confirmed in her deposition testimony that both the promotional and open registers were pulled by the request of [Corley]" and cites pages eighteen and nineteen of Howard's deposition transcript. However, Howard's deposition testimony provides, in relevant part:

Q: Do you know if anyone previewed or canvassed the promotional register to determine who all was interested in that position?
A: Yes.
Q: What do you know about that?
A: **Well, I looked at it; Frances looked at it. Vera looked at it; We talked about it. And I think at some point [Corley] looked at it, you know, because he was over personnel.**
Q: He look at both lists, both registers?
A: **To be honest with you, I don't know....**
　　　＊　＊　＊　＊　＊　＊
A: **I mean [Corley] would get Frances to pull up stuff for him and, you know—and I know she printed it out for him, is what she told us. You know, I was over that area, but he didn't ask me.**
Q: [Frances] told you she printed out both registers?
A: **She said—no. She just said [Corley] asked for a copy of the register and she printed it out and gave it to him.**
Q: Which register would that have been, the promotional or the open?
A: **I don't recall her indicating which one it was.**
(Howard Dep., pp. 18–20). Accordingly, this testimony by *no* means confirms that Corley engaged in such "canvassing" when selecting the register for the PM III position, and this court finds that Plaintiff's allegation to that effect is completely misleading and is a clear attempt to deceive the court. The court advises Plaintiff that such misrepresentation of evidence is dangerous and will not be allowed.

which, alone, are not enough to withstand a motion for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, the court concludes that summary judgment is warranted on this claim.[31]

### 2. *Denial of Access to 1999 Salary Study*

■ The State asserts that it did not seek the EEO Coordinators' opinion for the 1999 Salary Study because "SPD had just conducted a salary study less than three years earlier, [so] it had already on file, detailed information about the duties and responsibilities performed by each of the four incumbents" (Graham Aff., ¶ 14). Jackie Graham (hereinafter "Graham"), Deputy Director of SPD and the supervisor for all salary studies conducted by SPD analysts, stated that SPD conducted a structured interview[32] of each EEO Coordinator for the 1996 study, but did not do so for the 1999 study because SPD only needed to update the 1996 information (*Id.*). Graham avers that SPD updated the 1996 information by requesting that each of the EEO Coordinators, including Plaintiff, provide updated Form 40s[33] with current information about the duties and responsibilities that each EEO Coordinator was performing at that time (*Id.*). The information contained in these Form 40s was received, reviewed and incorporated into the study (*Id.*). SPD then submitted the updated job information to the southeastern states in the salary survey, and the

salary survey resulted in a salary increase for Plaintiff and all EEO Coordinators (*Id.*). Thus, the State has met its burden to refute the inference of discrimination for its actions in the 1999 salary survey. Clearly, it is a legitimate business decision to update job information from a survey conducted three years earlier, than to endure going through the structured process of completing a salary survey anew.

Accordingly, with the State articulating a non-discriminatory reason for its decision on the 1999 salary survey claim, the burden shifts back to Plaintiff to demonstrate that this stated reason was a pretext for racial discrimination. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. Likewise, on this claim, Plaintiff has failed to demonstrate that the State's stated reason for not giving the EEO Coordinators the opportunity to have input[34] into the 1999 salary survey is pretextual. Plaintiff has not come forward with any evidence that questions the veracity of these reasons or reveals any discriminatory animus on the part of the State. *See Holifield,* 115 F.3d at 1565. As a result of this failure to create a triable issue of fact as to the State's asserted reasons, summary judgment in favor of the State is due to be granted on this claim.

### C. *Plaintiff's Claims of Retaliation*

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he

---

**31.** The court need not address whether Plaintiff was more qualified than King because Plaintiff's inability to be "reachable" on the "open competitive" register inhibited him from being further considered for the PM III position.

**32.** In a structured interview each individual is asked to provide information in response to a serious of questions that are specific to the duties and responsibilities of that particular job.

**33.** A Form 40 is a position description questionnaire and contains detailed descriptions of the duties and responsibilities assigned to a specific position.

**34.** The court notes that Plaintiff, as well as the other EEO Coordinators, were allowed to provide input into the 1999 salary study through the Form 40s.

has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Plaintiff alleges that he was subjected to the following acts of retaliation: (1) "retaliation relative to the salary increase that the 1999 Classification and Compensation survey had determined was appropriate for EEO Coordinators," (2) "several specific instances of retaliation" by Commissioner Petelos, and (3) retaliation regarding the denial of "secretarial assistance" for the Plaintiff (Doc. # 41, pp. 4, 11–12–20, 22–26). The court finds that two of these alleged acts do not rise to the level of judicially recognized adverse employment actions, and thus first focuses on these two actions.

### 1. Salary Increase and Retaliation by Commissioner Petelos

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000).[35] Whether an employee has suffered an adverse employment action is normally considered on a case-by-case basis. *Id.* at 586. It is clear, however, that not all conduct taken by an employer which causes a negative affect on an employee constitutes adverse employment action. *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir.2001). There must be "some threshold level of

substantiality that must be met for unlawful discrimination to be cognizable." *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998). "This limitation is consistent with the basic principle that Title VII is . . . neither a general civility code nor a statute making actionable for the 'ordinary tribulations of the workplace.'" *Davis*, 245 F.3d at 1239 (quoting *Gupta*, 212 F.3d at 587); *see also Wu v. Thomas*, 996 F.2d 271, 273–274 (11th Cir.1993) (noting that an adverse employment action does not result from every unkind act, even those without economic consequences).

In *Davis*, the Eleventh Circuit emphasized that for an employment action to be adverse it "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." 245 F.3d at 1239. While proof of direct economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* Thus, to prove an adverse employment action "an employee must show a *serious and material* change in terms, conditions, or privileges of employment." *Id.* (emphasis in original). In determining whether a "serious and material" change in the terms, conditions, or privileges of employment has been established, *Davis* instructs the court to disregard the plaintiff's subjective view of the significance and adversity of the employer's action: "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (citation omitted).

In the instant case, Plaintiff claims that Commissioner Petelos' and Corley's denial of his request to draft a letter to Flowers to seek his salary increase[36] and certain specific actions[37] of

---

**35.** The court notes that determining whether an employment action is adverse for purposes of Title VII is a matter of federal, not state,

law. *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir.2000).

**36.** The court notes that Plaintiff does not al-

Commissioner Petelos constitute adverse employment action.[38] This court is convinced that no reasonable person could view these actions, whether individually or collectively, as having a "serious and material change in the terms, conditions, or privileges" of Plaintiff's employment. *See Davis*, 245 F.3d at 1239.

██ A materially adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). Thus, even if Plaintiff proved that Commissioner Petelos and Corley denied his request to draft a letter to Flowers to seek his salary increase and that he drafted the letter for Commissioner Petelos' signature,[39] such actions do not rise above "mere inconvenience" when the actions are unaccompanied by any tangible harm, and thus do not constitute an adverse employment action. Plaintiff presented no evidence that his employment was substantively or tangibly affected by the denial of his letter request by Commis-

sioner Petelos and Corley. In fact, the evidence before this court indicates that Plaintiff received his salary increase retroactive through October 1, 1999 from SPD, and he received a $171.14 payment for the amount of the September 1999 increase from the BOA. The evidence further indicates that Plaintiff received these amounts with the assistance of Commissioner Petelos and Corley.[40]

Further, the individual acts of Commissioner Petelos, of which the Plaintiff complains, do not constitute "a *serious and material* change in the terms, conditions, or privileges of employment." *Davis, supra*. Commissioner Petelos' alleged acts of verbal assault, humiliation, "lashing out" and "writing [Plaintiff] up," appear to constitute various ways in which Commissioner Petelos criticized Plaintiff and his job performance. The Eleventh Circuit has clearly established that such employer criticism, including negative job performance evaluations, do not amount to adverse employment actions. *See id.* In *Davis*, the Court elucidated the following:

lege that he was subjected to retaliation by the *delay* in receiving his salary increase, instead he alleges that he was subjected to retaliation by the *denial of DHR assistance* in receiving his salary increase.

**37.** In the Pretrial Order, Plaintiff complains that Commissioner Petelos engaged in retaliation during the following instances: (1) he "verbally assaulted" Plaintiff for the investigation findings that Corley or other DHR officials had engaged in race discrimination and retaliation, (2) he sought to humiliate Plaintiff on one occasion, (3) he intentionally refused to select from the "promotional" register to fill the vacancy for the PM III position, (4) he "lashed out" against Plaintiff over the phone on several occasions, and (5) he "wrote" Plaintiff up for failing to investigate some cases (Pretrial Order, p. 9).

**38.** As aforementioned, in the Pretrial Order, Plaintiff appears to allege that Commissioner Petelos retaliated against him by not selecting the "promotional" register as the means of selecting an individual to fill the PM III va-

cancy (Pretrial Order, p. 9). The court need not address this argument as it discussed this issue more fully in connection with the failure to promote claim, *supra*, and concluded that Plaintiff failed to establish pretext.

**39.** Plaintiff alleges that he "drafted his own letter and subsequently got [Commissioner Petelos] to simply sign the letter" (Pretrial Order, p. 8).

**40.** Assuming Plaintiff's allegations are true, even if Commissioner Petelos denied Plaintiff's request to draft the letter to Flowers, he assisted Plaintiff by signing the letter. Corley, on the other hand, directly assisted Plaintiff in receiving his September salary increase amount from the BOA. Corley learned that Plaintiff could be paid the September salary increase through the BOA and consented to a BOA judgment against DHR in the amount of the September increase (Corley Supplemental Aff., ¶ 6).

Given that Congress in § 2000e–2(a) has expressly limited the types of employer actions which may give rise to a Title VII discrimination claim, such a claim rarely may be predicated merely on an employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment. An employee who receives criticism or a negative evaluation may suffer a loss of self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.' (citation omitted) . . . Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit the employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee. Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely-without more-establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause.

*Id.* at 1242. Here, there is no evidence that Commissioner Petelos' alleged acts amounted to formal discipline or caused Plaintiff any present or foreseeable future economic or tangible injury. Accordingly, because the Plaintiff has failed to demonstrate that he has suffered any employment action by Commissioner Petelos that

seriously or materially affected the terms or conditions of his employment, these alleged acts fall short of constituting adverse employment action.

Consequently, because adverse employment action is an indispensable element of a retaliation case, Plaintiff's failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to his case. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998) ("Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case.") (citations omitted). Accordingly, and finding no material issues of fact or law in existence, summary judgment on these retaliation claims are warranted

### 2. Secretarial Assistance

As previously mentioned, assuming that Plaintiff has established a prima-facie case of retaliation on the remaining claim, the court focuses its analysis on two issues: first, the court considers whether the State has met its burden to articulate non-retaliatory reasons for actions at issue. Second, the court considers whether Plaintiff has produced sufficient evidence to conclude that the State's proffered non-retaliatory reasons are pretextual.

The State's proffered legitimate, non-retaliatory reason for not promptly filling the secretarial position in Plaintiff's office is that DHR was experiencing serious budget constraints at that particular time (Doc. # 24, p. 37). Former Commissioner Petelos' affidavit provides, in relevant part,

[Plaintiff's] request to replace his secretary was not immediately granted because the department was faced with budget problems and had to make a number of reductions throughout the department. For example, the Food

Stamps department lost a number of employees through early retirement and to my best recollection at this time, none of those positions were filled. Adult Protective Services was another department where vacant positions were not filled.... [Plaintiff's] secretary was replaced when we were able to do so. He was not treated differently than any other administrator who lost support staff.

(Petelos Aff., ¶s 6, 7). In addition, Corley's affidavit provides, in relevant part,

It is not unusual for a request for secretarial replacement to be denied. For example, I, myself, have been without a secretary since September of 1997. I have made repeated requests for DHR to fill the position but my requests have been denied. Likewise, Charles Cook, Director of Program Integrity has not had a secretary since 1994. He has made several requests that the position be filled but his requests have never been approved. Mr. Cook is a white male. Also, Jim Williford, a white male who works in Program Integrity, has not had a secretary since 1998.

(Corley Supplemental Aff., ¶ 12).

 Accordingly, the burden shifts back to Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff may establish pretext by undermining the credibility of the defendant's proffered explanations. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997). Instead of relying on conclusory allegations of retaliation, the plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could find them unworthy of credence." *Id.* In this case, Plaintiff simply challenges the wisdom of the State's decision not to fill the secretary vacancy and has not presented the court with any evidence that the State's stated reasons are unworthy of belief. As a result, Plaintiff has failed to produce sufficient evidence for a reasonable factfinder to conclude that the State's stated reasons are pretextual. Summary judgment is therefore warranted on this claim.

### D. The State's Motion to Strike

 The Court now turns to the State's Motion to Strike Portions of Affidavit (Doc. # 46). Federal Rule of Civil Procedure 56(e) makes it plain that affidavits submitted in opposition to a motion for summary judgment, such as the affidavit at issue here,

shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e). The requirements of Rule 56 make it plain that affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper. *See, e.g., Story v. Sunshine Foliage World, Inc.,* 120 F.Supp.2d 1027, 1030 (M.D.Fla.2000). *Accord, Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir.2000). Affidavits which fail to meet the standards set forth in Rule 56(e) may be subject to a motion to strike. *Givhan v. Electronic Eng'rs, Inc.,* 4 F.Supp.2d 1331, 1334 (M.D.Ala.1998). However, if an affidavit contains some improper material, the court need not strike the entire affidavit, rather it may strike or disregard the improper portions and consider the remainder of the affidavit. *Id.* at 1334 n. 2.

While it may be true that portions of Plaintiff's affidavit fail to comport with the requirements for such affidavits set forth by Rule 56(e) and case law interpreting it, the court finds it unnecessary to reach the merits of the State's motion to strike. The court has reviewed and considered Plaintiff's affidavit and finds that nothing contained in it, whether it be properly included or not, would cause this court to deny the State's motion for summary judgment, which for the reasons set forth in this Memorandum Opinion and Order is due to be granted. Consequently, the motion to strike portions of Plaintiff's affidavit is due to be DENIED as moot.

## V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the defendant's motion for summary judgment (Doc. # 23) is GRANTED and the defendant's motion to strike portions of affidavit (Doc. # 46) is DENIED as moot. Further, the Clerk of the Court is DIRECTED to remove the above-styled case from the trial docket.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.