**Ross G. LAING, Plaintiff,**

v.

**CDI CORPORATION, Defendant.**

No. 02–CV–6558L.

United States District Court,
W.D. New York.

Nov. 30, 2004.

Ross G. Laing, Pro Se, Rochester, NY.

Scott D. Piper, Harris Beach LLP, Pittsford, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

### INTRODUCTION

Plaintiff, Ross G. Laing, commenced this action *pro se* against his former employer, defendant CDI Corporation, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* CDI is a staffing company that provides technical personnel to clients for temporary assignments. Plaintiff, an African–American, is a former contract employee with CDI who was assigned to work as a drafter in the fuel systems design area at Delphi Automotive, one of CDI's clients.

Plaintiff alleges that CDI discriminated against him by failing to give him a scheduled raise in a timely fashion on account of his race. Plaintiff claims that it was only after he voiced complaints about the discriminatory treatment that he eventually was given the raise retroactively.

Before the Court is CDI's motion for summary judgment. (Dkt.# 16). CDI argues that plaintiff's claims fail because he cannot show that he suffered an adverse employment action or that the alleged conduct occurred under circumstances giving rise to an inference of discrimination. As set forth below, CDI's motion for summary judgment is denied.

## FACTS

Unless otherwise indicated, the following facts are not in dispute. Plaintiff began working for CDI on January 28, 1999 as a drafter for $17.00 an hour. In March 2000, plaintiff received his first employee performance appraisal, which was quite positive. He received a raise to $21.00 an hour, retroactive to his anniversary date of hire, January 28. On February 1, 2001, plaintiff received another positive appraisal and a raise to $21.84 per hour, again retroactive to his January anniversary date. In January 2002, plaintiff claims that he was scheduled to receive another employee appraisal by manager Annette Kendrick. However, before that appraisal was completed, Kendrick was released as part of a reduction-in-force by CDI.

Michael Callahan replaced Kendrick as manager and assumed her administrative duties, which included completing performance appraisals. On January 21, 2002, plaintiff asked Callahan about the status of his appraisal. Callahan told plaintiff he would get back to him. The next day, Callahan held a meeting with CDI employees during which he announced that, because Delphi cut the overall billing rate for employees, CDI was imposing a wage freeze and most employees would not receive raises. Those employees, however, that were scheduled to have or already had their appraisals on or before February 1, 2002, would receive raises. Plaintiff assumed that he was one of the employees that would receive an appraisal and raise because Kendrick had scheduled his appraisal for January 17, 2002, and his anniversary date was in January.[1]

On February 19, 2002, Callahan met with plaintiff and gave him a positive appraisal. Callahan told plaintiff that he had received a 23% increase in pay over the last two years and that he would be leaving the financial part of the review blank pending a change by Delphi to his billing rate. Plaintiff believed that he was entitled to a raise and told Callahan as much. After this meeting, plaintiff learned that at least four white employees had received raises during this period.

On March 20, 2002, plaintiff again met with Callahan to discuss why he had not received a raise. Callahan again denied that plaintiff was entitled to a raise because he was not on the calendar scheduled for an appraisal when the wage freeze went into effect. Callahan contacted Antonia Scott, a CDI human resources employee that had assisted Callahan in compiling the appraisal review list, and confirmed this fact during his meeting with plaintiff.

On April 5, 2002, plaintiff called CDI's Regional Vice President, Scott Rhodes, and complained about the fact that he had not received a raise. Plaintiff told Rhodes that he believed Callahan had discriminated against him. Plaintiff told Rhodes that his anniversary date should control whether he was entitled to a raise. Rhodes told plaintiff he would investigate the matter and get back to him.

On April 16, 2002, after speaking with Rhodes, Callahan met with plaintiff. Callahan denied discriminating against plaintiff, told him that he had just made a mistake. He should have used plaintiff's actual anniversary date to determine

---

1. There appears to be a dispute about whether plaintiff was, in fact, scheduled for an appraisal. Plaintiff claims that Kendrick had scheduled his appraisal on her "calendar" for 10:30 a.m. on January 17, 2002, the same day that she was released pursuant to the reduction-in-force. Kendrick, who submitted an affidavit on plaintiff's behalf in opposition to CDI's motion for summary judgment, corroborates this and states that she spoke with Callahan specifically about plaintiff's scheduled appraisal and raise. (Dkt.# 27). CDI, however, claims that it has no record of any such calendar.

whether he was eligible for a raise. Callahan then offered plaintiff a three percent raise retroactive to his anniversary date. Plaintiff responded that he believed CDI had treated him unfairly. He refused the raise and asked instead to be released immediately from his contract with CDI so that he could work for another contract supplier at Delphi.[2] Callahan allegedly agreed at first to release plaintiff from his contract, but when plaintiff asked for the release in writing, Callahan refused to release plaintiff. Callahan claimed to have conferred with Rhodes. He then told plaintiff that CDI would not release him from the contract, because it would set bad precedent for other employees.

Plaintiff thereafter contacted Brenda Jones, CDI's Human Resource Generalist who was located in Arizona. Jones had ultimate human resource responsibility for all engineering employees, including plaintiff. Jones investigated plaintiff's complaint. Callahan told Jones that he was new to the manager's position, was very busy at the time, and simply had made a clerical mistake vis-a-vis plaintiff's raise. He claimed that, based on his quick review of plaintiff's file, it initially appeared that his last review occurred in February 2001, not January. Therefore, he believed that plaintiff was not eligible to receive the raise. After plaintiff complained about not receiving a raise, Callahan checked plaintiff's file again, saw that his anniversary date was in January. Once that was clarified, he offered plaintiff the raise retroactive to his anniversary date. He denied discriminating against plaintiff.

After her investigation, Jones held a telephone conference with plaintiff, Callahan, and Patricia O'Connor, another human resources employee. Jones told plaintiff that Callahan denied discriminating against him. Callahan reiterated that he had made an "honest mistake" when he looked at plaintiff's file, and they again offered plaintiff the three percent raise with back pay.

Plaintiff became upset during this call and again refused the raise. He told Jones that he thought CDI was covering up discrimination by Callahan, and that he wanted to be released from his contract. He also said that he wanted the investigation into his allegations of discrimination to be completed. Jones allegedly told plaintiff she would do that and get back to him. Plaintiff claims Jones never did get back to him.

Instead, within a few weeks, Callahan met with plaintiff in late April or early May 2002 and gave him another written performance appraisal, which plaintiff refused to sign. This appraisal was identical to the one Callahan gave him in February 2002 and contained the same substantive evaluation of plaintiff's work performance. There was one difference between the February and May 2002 appraisals. The financial section of the May appraisal was completed and recommended that plaintiff receive a three percent raise retroactive to January 28, 2002. Plaintiff refused the raise again and refused to sign the appraisal on the grounds that he believed CDI was trying to cover up Callahan's discrimination. He continued to insist on a release from CDI.

Despite his protestations, on May 9, 2002 plaintiff received a three percent raise to $22.50 an hour retroactive to January 28, 2002. In July 2002, after Delphi

**2.** It appears that CDI employees sign an agreement that includes a provision requiring them, upon termination or resignation, to wait 30 days before joining another contractor at the same work site. The provision is designed to prevent employees from continuously switching from contractor to contractor in search of better wages.

increased plaintiff's billing rate, he received another raise to $30.00 an hour.

Sometime in mid–2002, CDI went through another reduction-in-force, and Callahan was laid off along with several other employees. In February 2003, plaintiff resigned from CDI and accepted employment with another contract supplier at Delphi. He continues to work in the same drafter position at the same location as before.

Plaintiff filed a charge of discrimination with the EEOC on July 23, 2002 claiming that he was not given a timely raise because of his race. On July 31, 2002, the EEOC dismissed plaintiff's charge and issued a right-to-sue letter. Plaintiff commenced this action in federal court on October 29, 2002.

## DISCUSSION

### I. Summary Judgment in Discrimination Cases

When deciding a motion for summary judgment brought pursuant to Fed. R.Civ.P. 56, a court's responsibility is to determine whether there are issues to be tried. *Duse v. Int'l Bus. Machs. Corp.,* 252 F.3d 151, 158 (2d Cir.2001). Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' ... An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505);

*see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The general principles regarding summary judgment apply equally to discrimination actions. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (reiterating "that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'"). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).

I analyze plaintiff's discrimination claims pursuant to the familiar *McDonnell Douglas* burden-shifting rules. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff must first establish a *prima facie* case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory business rationale for its actions. "If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was

more likely than not based in whole or in part on discrimination.'" *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997)).

■ To establish a prima facie case of discrimination under Title VII based on race, plaintiff must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold*, 366 F.3d at 152. Defendant concedes that plaintiff has satisfied the first two elements. CDI's motion is directed to the third and fourth elements.

## II. Adverse Employment Action

■ CDI argues that plaintiff suffered no adverse employment action because CDI eventually gave plaintiff the raise retroactive to his anniversary date. Therefore, CDI contends that plaintiff did not suffer a material change in the terms and conditions of his employment. I disagree.

The Second Circuit has held that the lost use of wages, even if temporary, is a sufficient adverse employment action for purposes of the discrimination statutes. *Lovejoy–Wilson*, 263 F.3d at 224 (plaintiff established adverse employment action by proving she was suspended without pay for one week, despite the fact that defendant reimbursed her for the lost wages sometime later); *see also Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 100 (2d Cir. 2002) ("the lost *use* of wages for a period of time is, by itself, an economic injury that can qualify as a tangible employment action" sufficient to hold employer liable for harassment).

Moreover, although "adverse employment actions" often include discharge, refusal to hire, demotion, or reduction in pay, *see, e.g., Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999), they are not limited to those actions affecting just the "pecuniary emoluments" of employment. *Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789, 791 (2d Cir.1997). The Second Circuit has repeatedly held that lesser actions can qualify under the statute, so long as they result in a materially adverse change in working conditions. *See Morris*, 196 F.3d at 110.

It is undisputed that plaintiff was entitled to receive a pay raise, either because his anniversary date was in January or because his appraisal was scheduled in January. Plaintiff did not receive the raise and, therefore, lost the use of a small percentage of his wages for some measurable period of time, anywhere from one to three months, depending on when his raise originally was to have been processed.[3] In addition, he received the pay raise only after he made repeated complaints to Callahan and then upper management, which is a course of conduct other employees who received raises were not required to undertake. A jury could reasonably conclude that together, these actions constituted a material adverse change in the conditions of plaintiff's employment. *Lovejoy–Wilson*, 263 F.3d at 224 (although plaintiff was reimbursed for her lost wages, "the reimbursement occurred 'some time later.' The plaintiff thus may have at least suffered the loss of the use of her wages for a time. This would be sufficient to support a jury's finding that she suffered an adverse employment action.").[4] That is par-

---

**3.** There may be an issue as to the length of this time period, given that plaintiff declined

the raise for the first time sometime in mid-April.

**4.** *Smith v. Alabama*, 252 F.Supp.2d 1317,

ticularly true if the reason for the delay was Callahan's intentional discrimination based on plaintiff's race.[5]

### III. Inference of Discrimination

■ CDI next argues that plaintiff cannot show that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. At issue is Callahan's motivation when he initially denied plaintiff the raise. Based on the record as a whole, and drawing all reasonable inferences in plaintiff's favor, I find that questions of fact exist regarding Callahan's motivation that cannot be resolved on summary judgment.

It is true that CDI presented evidence that Callahan simply made a "mistake" when he determined that plaintiff was ineligible to receive a raise. Callahan told Jones that he was new to the position and, based on a quick review of plaintiff's personnel file, it initially appeared to him that plaintiff's last review was in February 2001—not January 2001. As a result, Callahan made the assumption that plaintiff was not eligible to receive another appraisal until February 2002, after the wage freeze. After plaintiff complained to Rhodes, Callahan rechecked plaintiff's file and saw that his anniversary date was January 28, and not in February, apologized and then offered him the raise. CDI also points to plaintiff's admission that he had very little contact with Callahan prior

to February 2002, and that he had never heard Callahan direct derogatory comments about minorities to him or to other employees. Those explanations may well be accepted by the jury and, if so, plaintiff's claim would fail.

Plaintiff submitted evidence, however, that calls into question Callahan's stated reasons for the delay in giving plaintiff the raise. First, the record shows that Callahan gave a different explanation on three occasions for why he determined that plaintiff was not eligible to receive a raise. Callahan first told plaintiff in February that he was not receiving a raise because he had had a substantial salary increase over the last two years, as compared to other CDI employees, and that he could not receive a raise until Delphi changed his billing rate. Then in March, Callahan told plaintiff he was not eligible for a raise because he was not on the calendar and was not scheduled for an appraisal prior to the wage freeze. Finally, when Jones investigated plaintiff's complaints of discrimination in April, Callahan told Jones that he made the decision that plaintiff was not eligible for a raise when he reviewed plaintiff's file and mistakenly relied on the date of his 2001 appraisal.

The jury could determine that these multiple justifications belie the true reason. Furthermore, plaintiff has submitted evidence that the stated reasons are not

---

1333 (M.D.Ala.2003) aff'd, 103 Fed. Appx. 666 (11th Cir. Apr.9, 2004), the case upon which defendant primarily relies, is distinguishable. There, plaintiff alleged that his supervisor denied his request to draft a letter requesting plaintiff's salary increase, resulting in plaintiff having to draft the letter himself for his supervisor's signature. Plaintiff then received the salary increase. Plaintiff argued that his supervisor's action of refusing to assist him in obtaining his raise constituted an adverse employment action. Interpreting Eleventh Circuit case law, the Court held that no reasonable juror could conclude that such a mere

inconvenience without any "tangible harm" constituted an adverse employment action. *Id.* at 1333. Here, however, plaintiff did suffer some tangible employment action in the lost use of wages for a period of time, which the Second Circuit has held is a sufficient adverse employment action.

**5.** It is noteworthy that plaintiff testified at his deposition that he felt stress and anxiety at his job during this course of these events, and that he resigned from CDI nine months later.

worthy of belief. As to Callahan's alleged confusion about whether plaintiff was scheduled for an appraisal before the wage freeze, Annette Kendrick, Callahan's predecessor at CDI, states in an affidavit that Callahan knew plaintiff's appraisal was scheduled for January 2002. (Kendrick affidavit, Dkt. # 27).[6] She states that on January 17, 2002, the last day she worked for CDI, she handed plaintiff's file to Callahan, told him that plaintiff's appraisal was scheduled for that morning, and that he was to receive a seven percent raise. She then gave Callahan the paperwork necessary to process plaintiff's raise, which she had already completed. She also directed Callahan's attention to a calendar on her desk that listed all scheduled appraisals, including that of the plaintiff, whose appointment was highlighted that day.

As to Callahan's mistaken reliance on the date of plaintiff's 2001 appraisal, Kendrick states that Callahan was well aware of the fact that many 2001 appraisals were performed very late (i.e. subsequent to an employee's anniversary date) by Kendrick's predecessor, Tom Kuczynski, and that much of Kendrick's job was spent trying to get CDI caught up on the 2002 appraisals. Moreover, plaintiff points to the fact that his 2001 written appraisal, the document upon which Callahan claims to have relied when deciding whether plaintiff was eligible for a raise, states specifically that plaintiff's next appraisal was scheduled for January 2002.

Plaintiff also presented evidence that Callahan had a discriminatory attitude toward women and minorities. Kendrick states that she complained to Brenda Jones and to Bob Lyons, Vice President of Human Resources, about Callahan's discriminatory attitude toward both minorities and women shortly after Callahan was hired in August 2001. She states that Callahan made comments to her during meetings about "those people," referring to minorities, and "you women," referring to Kendrick and others. Kendrick also claims that when she spoke with Jones about Callahan's discriminatory attitude, Jones acknowledged that Callahan "was going to be a problem," "was part of the 'old boys club mentality,'" and had "a Kodak mentality." Kendrick also states that CDI's attorney, Scott Piper, contacted her about this case and, during an interview with her, told her that Callahan had "caused many problems" and that CDI "just wanted to forget about him."

Finally, the record shows that, including plaintiff, there were six employees that received raises retroactive to late 2001 or early 2002. It appears that all five of the other employees received their raises in a timely fashion. Further, at least four of these employees (Paul Reed, Jennifer Ustin, Catherine Vavonese, and Michael Yax), were white. The record does not indicate the race of the fifth employee (John Stoessel).

In its reply, CDI submitted (but did not file)[7] the reply affidavit of Jones, who

6. CDI makes the bold argument that, because Kendrick was terminated from CDI as part of a reduction-in-force, her entire affidavit is "suspect as biased, and should be disregarded by the Court." (Dkt.# 28, p. 5). Whether Kendrick is biased, and what role, if any, that alleged "bias" would have on the weight to be given her sworn statement is not for the Court to decide. Under well-settled principles, the Court's role in deciding a summary judgment

motion is not to weigh evidence, but to determine whether there are issues to be tried.

7. The docket sheet indicates that this affidavit was never filed. Most likely, this is because Jones' affidavit does not contain an original signature, but only a fax copy. A courtesy copy of the affidavit, which was received by the Court on November 13, 2003, is found in the file. The Court has assumed for purposes

denies making the statements to Kendrick regarding Callahan that are contained in Kendrick's affidavit. (*See* courtesy copy of Jones Reply Affidavit, received on November 13, 2003). In addition, CDI filed the affidavit of its attorney of record, Mr. Piper, who denies making any such statements about Callahan to Kendrick.

The point of the above elaboration is to demonstrate that questions of fact exist as to whether Callahan was motivated by discriminatory animus against plaintiff because he is black or made a simple clerical error in denying plaintiff's raise. There is conflicting evidence. But, there is sufficient evidence in the record that Callahan's failure to give plaintiff a timely raise occurred under circumstances giving rise to an inference of discrimination. Plaintiff has also presented sufficient evidence upon which a jury could find that the reasons CDI gave for Callahan's actions were unworthy of belief. *See Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 382–83 (2d Cir.2001) (same). These factual disputes cannot be decided by the Court as a matter of law, but must resolved by a jury. Therefore, CDI's motion for summary judgment is denied.[8]

## CONCLUSION

Defendant CDI's motion for summary judgment (Dkt.# 16) is denied.

IT IS SO ORDERED.

---

of this motion that this affidavit was properly filed and, therefore, has considered the allegations contained therein.

8. Finally, CDI seeks to dismiss so much of plaintiff's complaint that asserts a retaliation claim against it on the grounds that such a claim was not included in plaintiff's EEOC charge. I disagree. It is well-settled that claims not asserted in an EEOC charge may be pursued in a subsequent federal court action if they are "reasonably related" to claims that were filed with the agency. *Deravin v. Kerik*, 335 F.3d 195, 200–201 (2d Cir.2003); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.2001). A claim that an employer retaliated against an employee for filing a charge of discrimination is considered "reasonably related" to the original claim. *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402–1403 (2d Cir.1993). Moreover, "[a] claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Fitzgerald v. Henderson*, 251 F.3d 345, 359–60 (2d Cir.2001)(internal quotation marks and citation omitted). Under either theory here, plaintiff's claim of retaliation would be reasonably related to his original charge. Therefore, CDI's motion for summary judgment on plaintiff's retaliation claim is denied.